PETER PINDER, PLAINTIFF IN ERROR, vs. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

CRIMINAL LAW.—Accidental killing of bystander in attempt to kill another. When excusable. Examination of jurors on *voir dire*. Self defense.

1. The examination of jurors on the *voir dire* in criminal trials is not to be confined strictly to the question formulated in §10, p. 446, McClellan's Digest, but should be so varied and elaborated as the circumstances surrounding the jurors under examination in relation to the case on trial would seem to require in order to obtain a fair and impartial jury whose minds are free of all interest, bias or prejudice.

2. Where the party on trial belongs to the negro race, it is error to refuse the putting of the question to the jurors on the *voir dire:* "Could you give the defendant, who is a negro, as fair and

impartial a trial as you could a white man, and give him the same advantage and protection as you could a white man upon the same evidence?" such question being pertinent to test fully the existence of bias or prejudice.

3. Though there is nothing in the statute to prohibit the court itself from exclusively conducting the examination of jurors on the *voir dire*, yet the most convenient and better practice, sanctioned by long and almost universal usage, is to allow such examinations to be conducted by the counsel in the cause, the court judicially supervising, directing, supplementing or rectifying the same.

4. In capital cases, instructions to the jury should give to the accused the benefit of the theory that the killing must have been *unlawful* or without a legally recognized excuse or justification, in order to constitute the crime of murder or manslaughter.

5. When the court undertakes to instruct the jury as to the several degrees of homicide, and the facts that constitute each as defined by statute, it is the correct and better practice in all such cases, that he should also give to the jury the circumstances that constitute the exceptions mentioned in the statute wherein the killing is declared to be justifiable or excusable.

6. In a trial for murder it is error for the court to charge the jury that "to constitute excusable homicide by reason of the defendant acting in self-defence, it is necessary that the defendant should have perpetrated the act under the '*well grounded*' belief justified by the surroundings, that it was necessary to take the life of the person slain in order to save his own life," etc. Smith vs. State, 25 Florida, 517, cited and approved. All that can be required of the prisoner in such cases would be to show that he was surrounded by such a condition of affairs as made it, from his standpoint, *reasonable* for a cautious and prudent man to *believe* that it was necessary to fire the fatal shot or strike the fatal blow in order to save himself from death or great bodily harm.

7. Where it is deducible from the evidence that the killing of the deceased by the defendant was wholly unintentional and accidentally brought about by the excusable or justifiable defence of himself against impending danger from a third party, it is *error* for the court to charge the jury that in order to avail himself of the plea of "self-defence, "it is necessary that the defendant should have perpetrated the act under the well grounded belief, justified by the surroundings, that it was necessary to take the life of the '*person slain*' in order to save his own life," etc.

8. If the killing of the party intended to be killed would, under all the circumstances, have been excusable or justifiable homicide upon the theory of self-defence, then the unintended killing of a bystander, by a random shot fired in the proper and prudent exercise of such self-defence is also excusable or justifiable,

9. If the killing of the intended victim in such a case would have been reduced by the circumstances to murder in the second or third degree, or to manslaughter in any of the degrees, then the unintentional and accidental killing of a bystander resulting from any act designed to take effect upon the intended victim, would be likewise reduced to the same grade of offence as would have followed the death of the victim intended to be killed.

Writ of Error to the Circuit Court for Clay county.

The facts of the case are stated in the opinion of the court.

*S. Y. Finley* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

TAYLOR, J. :

At the Spring term, 1890, of the Circuit Court for Clay county, Peter Pinder, the plaintiff in error, was indicted for the murder of one Joseph Tillman, on October 11th, 1889. The alleged instrument of death used being a Winchester rifle. At the next ensuing Fall term of said Circuit Court, Pinder was tried, convicted and sentenced to death, and from such conviction and sentence the cause is brought to this court upon writ of error. It appears from the record that when the jury was being empanneled who tried the accused, and when the jurors were being tested upon the *voir dire* as to their competency, &c., the prisoner's counsel propounded to J. F. Geiger and to other jurors the following question: "Could you give the defendant, who is a negro, as fair and impartial a trial as you could a white man, and give him the same advantage and protection as you would a white man upon the same evidence;" which question the court below refused to allow to be propounded to the jurors upon their *voir dire*; and refused to allow counsel in the cause to propound any questions to the jurors upon the *voir dire*; the court itself insisting upon propounding all questions to the jurors touching their competency, and propounding only such questions to them as are in express terms provided for in sec. 10, p. 446 McClellan's Digest. The refusal of the

court below to allow the question quoted above to be propounded to the jurors upon the *voir dire*, is assigned as error, and will be considered first. We think the court erred in refusing to permit this question to be propounded to the jurors. Though the question is not in express terms provided for in the statute above cited, yet it was a pertinent, and, as we think, proper question to test fully the existence of bias or prejudice in the minds of the jurors. It sought to elicit a fact that was of the most vital import to the defendant; and a fact, too, that if existent, was locked up entirely within the breasts of the jurors to whom the question was propounded; a knowledge of the existence of which could only be acquired by interrogating the juror himself. The answer to it if in the affirmative could have worked no harm to the juror or to anyone else, but would have done credit to the humanity and intelligence of the juror, and would have satisfactorily exhibited to the court and to the defendant his entire competency, so far as the element of bias or prejudice was involved. But, if the answer to it from the jurors had been in the negative, then, we have no hesitancy in saying that it would have shown them to be wholly unfit and incompetent to sit upon the trial of a man of the negro race, whose right to a trial by a fair and impartial jury is as fully guaranteed to him under our constitution and laws, as to the whitest man in Christendom. And such incom-

petency asserts itself with superadded force in such a case as this where the life or death of the defendant was the issue to tip the scale in the jury's hands for adjustment.

The examination of jurors upon their *voir dire* is not necessary to be confined strictly to the questions formulated in the said section 10, p. 446, McClellan's Digest, but should be so varied and elaborated as the circumstances surrounding the juror under examination in relation to the case on trial would seem to require, in order to obtain in every cause a fair and impartial jury, whose minds were .free and clear of all such interest, bias or prejudice as would seriously tend to militate against the finding of such a verdict as the very right and justice of the cause would in every case demand. The provision of the law above referred to does not so expressly provide, but upon the *roir dire* it is the universal practice to propound to jurors questions as to their age ; whether they are registered voters or not; where they reside ; whether there exists any unusual relations of friendship between them and either of the parties litigant in the cause ; and we think this practice correct and proper ; and, as we think, fully sanctioned by that clause of the section of the statute quoted, which provides for the inquiry in general as to whether the juror "is otherwise incompetent." State vs. Madoll, 12 Fla., 151 ; Pierce vs. State, 13 N. II., 536 ; People vs. Reyes, 5 Cal., 347 ; People vs. Car Soy,

57 Cal., 102; People vs. Christie, 2 Parker's Crim. Rep. (N. Y.), 579; Jones vs. State, 2 Blackf. (Ind.), 475; Lester vs. State, 2 Texas App., 432; Milan vs. State, 24 Ark., 346.

While sec. 10, p. 446, McClellan's Digest, in enumerating the grounds of challenges to jurors for cause, uses the language, "The *court* shall, on the motion of each party in any suit, examine on oath any person who is called as a juror therein, to know whether he is related to either party," &c., yet there is nothing in the statute that inhibits the conducting of the examination of jurors on the *voir dire* by the counsel in the cause for the State and for the defence, or that necessarily imposes upon the Judge himself the burden of the conduct of such examination. It has been the universal practice in this State, so far as we know, for such examinations to be conducted by the counsel in the cause; the court, of course, judicially supervising and directing the same, and taking part therein either to supplement or rectify. And we think this is the most convenient and better practice, certainly having the sanction of long and almost universal usage. Still there is nothing in the statute to prohibit the court from exclusively burdening itself with the entirety of such examinations if it sees proper to do so.

The next error assigned is, that the charge of the court to the jury was misleading and erroneous. While the exception to the charges of the court does

not specifically point out any particular part or portion
of the charges that are relied on for error by the de-
fendant's counsel, and might, for that reason, be de-
clined to be considered by this court, according to its
repeated rulings in other causes, yet, as human life is
involved, and as the cause will have to go back for an-
other trial, we think it proper, without intending to
change or modify the former precedents of the court,
to make some suggestions in reference to the instruc-
tions of the court below to the jury in this cause.    And
to a proper understanding on the applicability of these
charges to the evidence adduced in the cause, we will
give the evidence in full as disclosed by the record, as
it is not voluminous.    Ansel Gillison, for the State,
testified :  " I know Peter Pinder, the defendant, by
sight ; I knew Joseph Tillman, the deceased, by sight ;
I saw Tillman die ; it was in Clay county, Florida, on
the 11th of October, 1889.    There was a big crowd, doz-
ens of them, all there by my shanty playing on a
chicken coop, gambling and standing around.    The
fuss was between Pinder, the defendant, and Dozier
Paskell.    Pinder said 'give me my fifty cents ;'  Paskell
said 'I'll give you nothing ; I won it.'    Pinder said 'I
will show that you will give it to me.'    *Press Coleman
was there with a pistol* when they were gambling.
Paskell said to Press Coleman 'give me my aid, my
pistol ;' he called it his aid.    Then Pinder raised up
on his feet saying to Paskell, 'what are you going to do

with it?' Then *backing off* he shot in the crowd three different times. Then Pinder started to run, and three men shot at Pinder where he was running. Pinder had a Winchester rifle lying across his lap when he was playing, and rose up with it. Don't know whether Coleman gave Paskell the pistol; *could not see for the crowd.* Heard Pinder ask Paskell 'what are you going to do with it?'' This was before the shooting, and Paskell was ten or fifteen feet away from Pinder. I was there when Tillman was examined after he was dead. Tillman fell over a log near my shanty, with the ace of diamonds in his hand; he was shot in his left side; saw the wound in Tillman's side; am satisfied that it was a bullet hole. I did not notice them before the row commenced; don't know what time of day; it was in the forenoon of the day. Don't know whether Paskell got up or not, or whether he took the pistol; *the crowd was around the players, and I could not see*; neither do I know, and cannot say, who fell after the first shot; I saw a man tumble, but cannot say who it was. Don't know whether it was Tillman or Paskell who was shot first; saw Tillman tumble over a log in front of my shanty door. Can't say what space of time between the two shots, nor how soon after the shots the men fell. Three men shot at Pinder when he was running; Pinder shot back when he got away down on the railroad. Pinder shot three times when he backed off.

Don't know who was shot first. I saw the shooting through the crack of the house. The defendant is a colored person, and so were all the others.

Allen Franklin for the State, testified: "I know Peter Pinder, the defendant; I knew Tillman; saw him dead; saw him alive about twenty minutes before his death; saw him playing cards with Pinder and a big crowd. The question arose between Pinder and Paskell about fifty cents over the game. Pinder asked for the fifty cents from Paskell; Paskell said : 'I will give you nothing.' Pinder had his rifle on his lap. When Paskell asked for his pistol, Pinder got up and asked once, twice and three times,' what are you going to do with it;' backing off all the time. Pinder then shot, and backing back Pinder shot three times into the crowd; saw Tillman fall where I cook; and Paskell fell against my shanty; saw Tillman fall dead. Did not hear Tillman say anything to Pinder, nor Pinder to Tillman. Tillman had no weapons on him at the time he was killed. Pinder was the only man that shot in the crowd. Pinder did not get up until after he asked Paskell what he was going to do with the pistol; he had his rifle in his hand when he rose. Paskell had already said, 'Press, give me my 38,' rising at the same time he asked for the pistol. I did not see Paskell get the pistol. There was a big crowd around."

With this testimony the State rested its case. The defendant introduced no evidence. The court then charged the jury as follows: 1st. "The prisoner stands indicted for murder in the first degree. In order to find the defendant guilty as charged, you must be sasisfied from the evidence, beyond a reasonable doubt, that the defendant, Peter Pinder, killed Joseph Tillman in the county of Clay, and State of Florida, before the finding of this indictment, by shooting him with a Winchester rifle, and that he killed said Tillman wilfully, and with malice aforethought, from a premeditated design to effect the death of said Tillman, or some human being." 2d. "If the jury should find from the evidence, beyond a reasonable doubt, that the defendant had a premeditated design to kill some other human being, and in the effort to effect such premeditated design, he killed the deceased, he would be as guilty as if he had effected his purpose and killed the person intended." 3d. "To constitute excusable homicide by reason of the defendant acting in self defence, it is necessary that the defendant should have perpetrated the act under the well grounded belief justified by the surroundings, that it was necessary to take the life of the person slain, in order to save his own life, or to prevent great bodily harm to himself, at the time he fired the fatal shot." 4th. "The premeditation which the law requires need not exist any particular length of time;

it is sufficient if you are satisfied from the evidence, beyond a reasonable doubt, that he had deliberated, even if but a moment, before acting, and that his action was the result of such deliberation." 5th. "Murder in the second degree consists in the killing of a human being by any act iminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 6th. "Manslaughter in the second degree consists in the killing of a human being, without design to effect death, in the heat of passion, but in a cruel and unusual manner, unless the killing be under such circumstances as to constitute excusable or justifiable homicide." 7th. "Manslaughter in the third degree consists in the killing of another in the heat of passion, without a design to effect death, by a dangerous weapon in any case except where such killing is excusable or justifiable." 8th. "Under this indictment the jury may convict the defendant either of murder in the first degree, murder in the second degree, manslaughter in the second degree, or manslaughter in the third degree, according as they may think that the evidence proves the commission of such offence beyond a reasonable doubt."

These instructions, in defining murder in the different degrees, and manslaughter in the different degrees, wholly fail to give to the defendant the benefit of the idea that the killing must have been "*unlawful*," that is, without "authority of law," in order to consti-

tute the crime of either murder or manslaughter. Sec*. 1, 2, *et seq.*, p. 350, McClellan's Digest. And again, in these instructions the statute definition of murder in the first and second degrees, and of manslaughter in the second and third degrees, is given, (with the omission above pointed out,) but there is a total absence of definition of manslaughter in the fourth degree, a conviction for which might have been warranted by the evidence ; and in this connection we think the eighth charge confines the jury to too narrow a limit. In this charge they are instructed that, "under this indictment they may convict the defendant of either murder in the first or second degree, or of manslaughter in the second or third degree," omitting entirely, as in the other charges, any mention of the fourth degree of manslaughter; the effect of which might have tended to mislead the jury into the belief that under the law they could not in this case convict of the lesser offence of manslaughter in the fourth degree. Again, in this eighth charge, there is absent any intimation to the jury that they had the power to acquit the prisoner, if the evidence warranted an acquittal, and from its phraseology might have a tendency to mislead the jury into a belief that they should not do otherwise than to convict of murder in the first or second degrees, or of manslaughter in the second or third degree ; and for this latter reason we think the eighth charge erroneous. We think, too, that there should have been to the jury instructions explanatory of the circumstances that constitute the exceptions mentioned in the statute wherein

the killing is declared to be justifiable or excusable. We think it the correct and better practice in all such cases when the court undertakes to instruct the jury as to the several degrees of homicide and the facts that constitute each as defined by statute, that he should also give to the jury the circumstances that constitute the exceptions mentioned in the statute wherein the killing is declared to be justifiable or excusable. Cato vs. State, 9 Fla., 163; Gladden vs. State, 12 Fla., 562; Brown vs. State, 18 Fla., 472.

We do not wish it to be inferred from anything said in the preceding paragraph, that we mean thereby to decide whether or not the omissions therein pointed out would of themselves cause us to reverse the judgment upon the evidence before us, but as the case goes back for a new trial upon other grounds, we think the views suggested should be called to the attention of the court, to be applied should they be warranted by the circumstances that may be developed on a new trial.

But the most serious error, the one that we think tended most to the prejudice of the prisoner, was the giving of the third charge above quoted. When applied to the evidence in this case, this charge is erroneous from two stand points: 1st. It is erroneous because it misstates the law of excusable homicide upon the theory of self-defence, as defined by this court in Smith vs. State, 25 Fla., 517. In this charge the jury are instructed that in order to sustain the theory of self-defence, "it is necessary that the defendant should have perpetrated the act under the *well*

*grounded belief, justified by the surroundings*, that it was necessary to take the life of the *person slain* in order to save his own life, or to prevent great bodily harm to himself at the time he fired the fatal shot.'' In the case last cited this court has, in effect, defined the law to be, that the belief or fear of iminent danger to life or person need not in fact be "well grounded," but if the conduct, the actions, coupled with the threatening language of the prisoner's assailant be such as to induce a reasonable, cautious man *to believe*, from the circumstances by which he was surrounded, that his life or person was in iminent danger unles he fires the fatal shot, then the killing would be excusable; and from these circumstances, *as they appeared to the slayer*, in the light of the evidence, must be deduced the *excusing belief* of the existence of iminent danger to life or person. All that could be required of the prisoner in such cases would be to show that he was surrounded by such a condition of affairs as made it, from his standpoint, *reasonable*, for a cautious and prudent man, to believe that it was necessary to fire the fatal shot or to strike the fatal blow in order to save himself from death or great bodily harm; even though it may turn out afterwards that the surrounding appearances were deceptive, and that in reality his life or person was in no danger at the time. The *reasonableness* of the belief or fear of the existence of such peril as will excuse the killing is for the jury to determine from all the facts and circumstances adduced in evidence. Though it may be

proven at the trial, in the calm solemnity of the court room, after the heat and excitement of the affray has long subsided, that, in point of fact, the prisoner was in no danger at the time; yet if the jury, after mentally putting themselves in the prisoner's shoes at the time of the killing, seeing from the evidence only as he then saw, and hearing from the evidence only as he then heard, believe from the whole evidence, that a cautious and prudent man would, under like circumstances, have been led reasonably to believe his life or person in iminent danger unless he did the act that caused death, then they should under the law by their verdict excuse the killing. Under this view of the law, it was error to instruct the jury that the belief of danger must be "*well grounded*." 2d. This third instruction is erroneous when applied to the facts in this case, because it deprived the defendant of the defence founded upon the theory that the killing of Joseph Tillman, the deceased, was unintentional, and accidentally brought about by the excusable or justifiable defence of himself against impending danger from a third party. While we do not pretend to say that this defence was maintained by the evidence before us, yet, we do think that such a defence was deducible from the evidence, and the prisoner should not have been shut off therefrom as he was by this third instruction, wherein the jury is told that in order to excuse the homicide upon the theory of self-defence, the defendant must show "that it was

necessary to take the life *of the person slain* in order
to save his own life," &c.    It was for the jury to de-
termine from the evidence whether the killing of Till-
man under the circumstances was unintentional, and
purely the result of a random shot fired by the defend-
ant at another party ; and whether the defendant fired
that random shot with the degree of prudence, discre-
tion and care for the lives of others, as the surrounding
circumstances at the time would justify, in the excus-
able or justifiable defence of his life or person from im-
pending imminent peril at the hands of the party shot
at but missed.    If the killing of the party intended to
be hit, would, under all the circumstances, have been
excusable or justifiable homicide upon the theory of
self-defence, then the unintended killing of Tillman, a
bystander, by a random shot fired in the proper and
prudent exercise of such self-defence, was also excus-
able or justifiable.    We think further that had the
killing of the intended victim been reduced by the cir-
cumstances to murder in the second or third degree, or
to manslaughter in any of the degrees, then the unin-
tended and accidental killing of a bystander, resulting
from any act designed to take effect upon the intended
victim, would be likewise reduced to the same grade of
offence as would have followed the death of the victim
intended to be killed.    1 Bishop on Criminal Law, sec.
334; Plummer vs. State, 4 Texas App., 310; Aaron
*alias* Bryant vs. State, 31 Ga., 167; Kerr's Law of
Homicide, sec. 198, Ibid, sec. 154.

From what has been said, under the circumstances of this case, the error of the third instruction becomes apparent wherein it requires the defendant in a case like this to show that the killing of the person *actually slain* was necessary to save his own life, &c.

Upon the ground that the court below erred in not permitting the examination of the jurors upon the *voir dire* on the line herein pointed out, we think the judgment and sentence of the court below should be reversed, and a new trial granted, and it is so ordered.