## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 25 2020, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Alex Cordell Hughes,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 25, 2020<br><br>Court of Appeals Case No.<br>20A-CR-149<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Salvador Vasquez, Judge<br><br>Trial Court Cause No.<br>45G01-1810-F1-33 |

**Bailey, Judge.**

# Case Summary

Alex Cordell Hughes ("Hughes") appeals his conviction for Criminal Recklessness, as a Level 5 felony.[1]  We affirm.

# Issues

Hughes presents three issues for review, which we restate as the following:

    I.      Whether the State abused its witness immunity power such that Hughes was denied due process;

    II.     Whether his fundamental rights were violated upon denial of his right to confront a witness against him; and

    III.    Whether the State negated Hughes's claim of self-defense as to the offense of Criminal Recklessness.

# Facts and Procedural History

Gary, Indiana, and the surrounding metropolitan areas have long been affected by gang violence.  In 2018, tensions reached a "boiling point" for Get Fresh Boys ("GFB") and Glen Park Affiliated ("GPA").  (Tr. Vol. V, pg. 169.) Between March and September of 2018, officers investigated two homicides and ten non-fatal shootings involving suspected members of those organizations.  On September 30, 2018, an exchange of gunfire took place at

---

[1] Ind. Code § 35-42-2-2.

the Merrillville, Indiana Walmart,[2] which investigating officers suspected to be related to tensions between GFB and GPA.

[4] Kyron Hawthorne, Sr. ("Hawthorne"), a suspected member of GPA, his pregnant girlfriend, Hailey Humes ("Humes"), his brother Jermaine Hawthorne ("Jermaine"), his friend Jimmy Brown ("Brown"), and his son Kyron Hawthorn, Jr. ("Junior") went into Walmart to purchase alcohol, but were turned away for lack of identification. At the same time, Hughes, a suspected member of GFB, and the mother of his two children, Shaqueta Wright ("Wright"), were in Walmart shopping for groceries. When Hughes and Wright left the store with their groceries and returned their cart to the cart corral, Hawthorne and Brown pursued them. Nine-year-old Junior ran after his father, and Humes ran to retrieve Junior.

[5] Hughes reached into the passenger side of Wright's vehicle and retrieved a gun. Brown and Hughes each fired a weapon multiple times. Wright fled to a Walmart employee's vehicle where she called 9-1-1. Jermaine returned to the Walmart. In the melee, Junior was struck in the chest by a bullet from Brown's gun. Humes struggled to drag and carry the injured child to safety; she placed him underneath a vehicle until help arrived. Hawthorne, who was unarmed, was struck by four bullets. The injured Hawthorne ran, hobbled, and crawled back toward the store, pursued by Hughes. Hughes continued to discharge his

---

[2] Witnesses frequently referred to this as the Hobart Walmart; however, its street address is a Merrillville address.

weapon until Hawthorne was inside. Brown followed Hawthorne into the store and surrendered his weapon at the request of an off-duty police officer.

[6] Several days later, Hughes was arrested. On November 12, 2019, he was brought to trial before a jury on charges of Attempted Murder,[3] Aggravated Battery,[4] Criminal Gang Activity,[5] and Criminal Recklessness. Hughes testified and admitted to firing multiple shots but claimed that he had acted in self-defense. On November 15, 2019, the jury convicted Hughes of Criminal Recklessness and acquitted him of all other charges. The trial court granted the State's motion to dismiss a criminal gang enhancement and, on December 18, 2019, sentenced Hughes to three years imprisonment. Hughes now appeals.

# Discussion and Decision

## Admission of Deposition Testimony

[7] Hughes contends that the prosecutor distorted the fact-finding process by giving Wright an illusory offer of use immunity at her deposition and then refusing to grant her use immunity at trial. According to Hughes, the State's unilateral actions prompted the trial court to declare Wright an unavailable witness and admit her deposition testimony into evidence.

---

[3] I.C. § § 35-42-1-1, 35-41-5-1.

[4] I.C. § 35-42-2-1.5.

[5] I.C. § 35-45-9-3.

[8] After the shooting, police officers executed a search warrant at Wright's home. They recovered a handgun not related to the Walmart shooting; however, Wright was charged with Neglect of a Dependent as a result of the recovery of the handgun. Wright was provided court-appointed counsel, the same attorney representing Hughes. The State, citing a possible conflict of interest, sought to have a different attorney appointed to represent Hughes. The trial court denied the motion as premature, and counsel proceeded with joint representation. Counsel took the position that Wright would be placing herself in legal jeopardy if she testified, because she had apparently driven Hughes away from the Walmart after the shooting.

[9] In its prosecution of Hughes, the State subpoenaed Wright for a deposition, and Wright appeared and invoked her Fifth Amendment privilege against self-incrimination. The State orally extended to Wright an offer of use immunity, representing that nothing to which she testified in her deposition would be used against her in a criminal prosecution. Wright testified that she "never seen nobody shooting" but she had heard shots and called police. (Tr. Vol. IV, pg. 200.) Hughes was provided with an opportunity to cross-examine Wright, but he declined to do so.

[10] At Hughes's trial, the Prosecutor advised the trial court:

> My next witness was going to be Shaqueta Wright who I understand is going to invoke her Fifth Amendment privilege to not testify. I will not be giving her use immunity, but because of that, it is my intention then as [she is] an unavailable witness

because she was deposed and had the opportunity to be confronted to read into evidence her deposition.

(*Id.* at 177.) Defense counsel argued that the State was unilaterally creating an unavailable witness and so the trial court should require the State to offer use immunity to Wright for her trial testimony or refuse to admit her deposition testimony. The prosecutor responded that it was the State's sole prerogative to extend witness immunity and, in the particular case, the prosecutor did not want to risk Wright changing her testimony. Wright was called to the witness stand, she invoked her Fifth Amendment privilege, and was declared an unavailable witness pursuant to Indiana Evidence Rule 804(a). The trial court, after hearing argument but finding no caselaw directly on point, declared: "absent case law, the defendant's motion is denied" as the prosecutor's request was "within the four corners of the Rule." (Tr. Vol. IV., pg. 190.)

[11] Indiana, like many states, has enacted legislation giving prosecutors the authority to grant use immunity to witnesses and obviate the self-incrimination privilege of the Fifth Amendment. *Bubb v. State*, 434 N.E.2d 120, 123 (Ind. Ct. App. 1982). Accordingly, Indiana Code Section 35-37-3-3(a) provides:

> Upon request of the prosecuting attorney, the court shall grant use immunity to a witness. The court shall instruct the witness, by written order or in open court, that any evidence the witness gives, or evidence derived from that evidence, may not be used in any criminal proceeding against that witness, unless the evidence is volunteered by the witness or is not responsive to a question by the prosecuting attorney. The court shall instruct the witness that

the witness must answer the questions asked and produce the items requested.

[12] Exercise of this power is limited to prosecutors. *Bubb*, 434 N.E.2d at 123. Although a defendant has no due process right to compel immunization of defense witnesses, the State may not use that power to interfere with the defense's presentation of its case or to prevent its witnesses from testifying. *Id.* at 124 (citing *Webb v. Texas*, 409 U.S. 95 (1972)).

[13] As to the Sixth Amendment right to a fair trial, "[t]he State must only refrain from interference with the defense's presentation of its case." *Id.* The Third Circuit Court of Appeals made the following statement reconciling witness immunity and due process concerns:

> [T]he evidentiary showing required to justify reversal on that ground must be a substantial one. The defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact finding process. Where such a showing is made, the court has inherent remedial power to require that the distortion be redressed by requiring a grant of use immunity to defense witnesses as an alternative to dismissal.

*U.S. v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978).

[14] Subsequently, in *Goudy v. State*, our Indiana Supreme Court outlined the circumstances in which the State may be found to have abused its use of immunity power:

"The State alone has the responsibility of prosecuting crimes. To meet that responsibility, the State, not the defendant, must have the authority to grant immunity." *Walters v. State*, 271 Ind. 598, 602, 394 N.E.2d 154, 157 (1979). In order to support a claim of prosecutorial misconduct with regard to the use of that authority, the defendant must prove that the State's decisions were made with the deliberate intention of distorting the fact-finding process. *Moore v. State*, 655 N.E.2d 1251, 1253 (Ind. Ct. App. 1995). Distortion of the fact-finding process may be established by showing:

(a) prosecutorial overreaching, through threats, harassment, or other forms of intimidation, has effectively forced the witness to invoke the Fifth Amendment, or the prosecutor has engaged in discriminatory use of immunity grants to gain a tactical advantage;

(b) the witness's testimony is also material, exculpatory, and not cumulative; and

(c) the defendant has no other way to obtain the evidence.

689 N.E.2d 686, 696 (Ind. 1997) (citation omitted.)

[15]     Here, we have little difficulty in concluding that the prosecutor manipulated the immunity power to gain a tactical advantage. First, the deposition testimony was apparently procured with an oral promise as opposed to compliance with Indiana Code Section 35-37-3-3.[6] Then at trial, the prosecutor's comments to

---

[6] Hughes has described the "grant of immunity" in this manner and the State does not contend otherwise.

the trial court make it plain that he did not want Wright to testify at trial. He argued that the State should not incur the "risk of her suddenly changing her testimony," after "she said she didn't remember and gave limited details," and there could be an "epiphany" and "remembering things a certain way." (Tr. Vol. IV., pg. 178.) We cannot condone the efforts to lock a witness into her story without any further opportunity for recollection, clarification, or development of detail.

[16] That said, the remaining criteria of *Goudy* is unmet. Wright claimed to have very limited knowledge of the shooting, that is, she had heard but not seen it. Hughes does not explain what material or exculpatory evidence was excluded by the refusal to grant use immunity to Wright at trial. And Hughes does not claim that he lacked the means to learn what testimony Wright could have been expected to offer. In the absence of demonstrated prejudice, we find no reversible error.[7] *See* Indiana Trial Rule 61; *see also Camm v. State*, 908 N.E.2d 215, 225 (Ind. 2009) ("Errors in the admission of evidence will be disregarded as harmless unless they affect a party's substantial rights.").

---

[7] This is a possible consequence of not conducting cross-examination at a deposition. "In a criminal prosecution, the State may take and use depositions in accordance with the Indiana Trial Rules." *State v. Owings*, 622 N.E.2d 948, 952 (Ind. 1993). And, because there is no obligation to continue the purported grant of immunity at trial, the defendant is left without a witness to testify where, as here, the witness chooses to invoke the Fifth Amendment privilege.

# Right of Confrontation

[17] Hughes claims that he was denied his right to confront a witness against him, guaranteed by the Sixth Amendment to the United States Constitution and by Article 1, Section 13 of the Indiana Constitution, which additionally provides that: "[I]n all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face[.]" Hughes did not raise his constitutional claims at trial and may prevail only upon showing fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002).

[18] Hughes acknowledges that he was afforded the opportunity to cross-examine Wright at her deposition and he elected not to do so. Rather, his focus seems to be upon the absence of Wright's trial testimony. Had Wright testified, Hughes could have cross-examined her. Ultimately, however, Wright chose to assert her Fifth Amendment right to avoid self-incrimination; she did not testify at trial. Hughes was not deprived of the opportunity to cross-examine a witness against him. His bald assertion that the State failed to act in good faith to procure Wright's testimony falls far short of establishing fundamental error.

# Self-Defense

[19] A person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal

recklessness. I.C. § 35-42-2-2. The offense is a Level 5 felony if "it is committed by shooting a firearm into an inhabited dwelling or other building or place where people are likely to gather." *Id.*

[20] Indiana Code Section 35-41-3-2(c) provides:

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:
>
> (1) is justified in using deadly force; and
>
> (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

[21] "A valid claim of self-defense is legal justification for an otherwise criminal act." *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011). Once a defendant raises a claim of self-defense, the State has the burden of negating at least one of the necessary elements. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). The State may meet its burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by relying on the sufficiency of the case-in chief. *Id.* Whether the State has met its burden is a question for the trier of fact. *Id.*

[22]     The standard for reviewing a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same standard used for any claim of insufficient evidence. *Id.* at 699. We neither reweigh the evidence nor judge the credibility of witnesses. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will reverse a conviction only if no reasonable person could say that the State negated the defendant's self-defense claim beyond a reasonable doubt. *Id.*

[23]     Hughes argues that the jury found he acted without criminal intent and the doctrine of transferred intent precludes his conviction for Criminal Recklessness. The doctrine of transferred intent has been explained as follows:

> Under the doctrine, a defendant's intent to kill one person is transferred when, by mistake or inadvertence, the defendant kills a third person; the defendant may be found guilty of the murder of the person who was killed, even though the defendant intended to kill another.

*Blanche v. State*, 690 N.E.2d 709, 712 (Ind. 1998). Hughes directs our attention to decisions in other jurisdictions where transferred intent has been found applicable in the case of a viable self-defense claim. See e.g., *State v. Stevenson*, 38 Del. 105 (1936) (an emergency excused the defendant from criminal liability for inflicting inadvertent injuries on a third person); *People v. Jackson*, 390 Mich. 621 (1973) (killing a bystander was not murder if done in self-defense).

[24]     Indeed, the merger of self-defense and transferred intent has long been recognized. In *Pinder v. State*, 27 Fla. 370 (1891), the reviewing Court stated that there had been some evidence presented that the defendant had been under

fire when he turned and shot into a crowd, killing a person with whom he had no controversy. The Court explained how transferred intent could be applicable:

> If the killing of the party intended to be hit would, under all the circumstances, have been excusable or justifiable homicide, upon the theory of self-defense, then the unintended killing of Tillman, a by-stander, by a random shot fired in the proper and prudent exercise of such self-defense, was also excusable or justifiable.

*Id.* at 386.

[25] Hughes contends that, if the doctrine of transferred intent in self-defense cases is cognizable in Indiana, he must be exonerated despite shooting into a building where people had gathered. But this argument presupposes that, if a person acts in self-defense, the right of self-defense cannot be extinguished. This is not the law in Indiana. Firing multiple shots undercuts a claim of self-defense "once a defendant disables the purported aggressor." *Gammons v. State*, 148 N.E.3d 301, 305 (Ind. 2020).

[26] Here, the Walmart manager testified that he saw Hughes pursue Hawthorne "after he was on the ground" in the crosswalk and had been "shot in the legs." (Tr. Vol. IV, pg. 97.) The injured man had "crawled in," and "more gunfire occurred," such that the window of the Burger King inside Walmart was "shot out." *Id.* at 99. Indeed, Hughes's testimony indicates that he continued to shoot after Hawthorne was wounded: "When he made it in the store, I stopped shooting." (Vol. VI, pg. 210.) Finally, the jury viewed a Walmart surveillance

video in which Hughes could be seen advancing upon the injured Hawthorne. There was evidence from which the jury could conclude that Hughes initially acted in self-defense and evidence from which the jury could conclude that his right of self-defense had been extinguished. Notwithstanding the possible application of the doctrine of transferred intent to circumstances of self-defense, here the State presented sufficient evidence to negate Hughes's claim, as it related to his conduct of shooting into a crowded building.

# Conclusion

[27] Hughes has not shown that he was deprived of due process, nor has he shown fundamental error in his trial. The State presented sufficient evidence to negate his claim of self-defense as to the conduct of Criminal Recklessness.

[28] Affirmed.

Vaidik, J., and Baker, Sr. J., concur.