Israel Jenkins v. The State of Florida.—Opinion of Court.

## ISRAEL JENKINS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

JUDICIAL DISCRETION IN CRIMINAL TRIALS—EXAMINATION OF JURORS ON VOIR DIRE—ACCOMPLICES AS WITNESSES.

1. In all such matters as the granting of applications to pass the trial of causes when called for trial, or to temporarily postpone the trial thereof in order to give counsel time to prepare papers to be filed therein; or, during the trial, to have the testimony adduced with sufficient slowness so that it can be written down *in extenso*, a large discretion must of necessity be reposed in the trial judge, and an appellate court can not declare any given exercise of such discretion to be error, unless the record discloses a palpable abuse thereof.

2. In testing the qualifications of jurors on the *voir dire*, it is not a proper field of inquiry to interrogate the proposed juror as to the comparative credence that he would or could give to the *evidence* of persons belonging to different races, who may or may not be witnesses in the cause.

3. An accomplice is a competent witness against his confederates in the crime, and a conviction may be had upon his uncorroborated evidence, where it satisfies the jury beyond a reasonable doubt.

Writ of error to the Circuit Court for Leon county.

The facts in the case are stated in the opinion of the court.

*Stephen C. Miller*, for Plaintiff in Error.

*The Attorney-General*, for Defendant in Error.

TAYLOR, J.:

Israel Jenkins, the plaintiff in error, was indicted at the Fall term, 1892, of the Circuit Court for Leon coun_

Israel Jenkins v. The State of Florida —Opinion of Court,

ty, for wilfully and maliciously burning a mill in the night time of the 14th day of October, 1892. He was tried at the same term of the court, convicted, and brings his case here by writ of error.

The first error assigned is the refusal of the court below, when the case was called for trial, to pass the trial thereof in order to give the defendant's counsel time to write out an affidavit showing the defendant's insolvency, so that, under the statute, he might have an absent witness subpœnaed at the cost of the State. It appears from the record that several days had elapsed between the finding of the indictment and the day upon which the trial was gone into, and no sufficient reason is shown in the record why this affidavit for the preparation of which time was desired, could not have been prepared before. In all such matters affecting the passing or temporary postponement of the trial of causes, a large discretion must necessarily be lodged in the trial judge; and we, in reviewing the exercise of this discretion, can not declare the refusal of the trial court to grant time to counsel to prepare papers in the cause, or to temporarily postpone the trial of the cause in order to obtain absent witnesses, to be error, unless the record discloses a palpable abuse of such discretion. No such abuse of judicial discretion is exhibited here, and we must, therefore, say that there was no error in the ruling assigned as such.

The second error assigned is the ruling of the court below in holding a juror to be competent, who, on the *voir dire*, made the following answer to the following

question: Q. " Is your mind in such a state that you would or could give the *evidence* of an Ethiopian or descendant of the African race the same weight that you would that of a Caucassian or descendant of the white race, in rendering a verdict upon this case?" A. " No; I don't think I could."

This question was not at all a proper one to be put to a juror on the *voir dire*, as it did not seek or tend to demonstrate the juror's bias for or prejudice against the *prisoner*, but was an effort to make the juror, in advance of the production of evidence in the cause, disclose what class of witnesses he would or would not give credence to. A field of inquiry that is not proper to be gone into in testing the qualification of jurors on the *voir dire*. To illustrate its impropriety: Suppose the prisoner's counsel had put this question to the juror: " John Doe, who is a white man, and Richard Roe who is a colored man will be witnesses in this case; Richard Roe the colored man will be the defendant's witness, Doe will be the witness against him—will you, or can you give as much credence or weight to Roe's evidence as to that of Doe in rendering your verdict?" Should the juror answer that Doe's would weigh the strongest with him, it would not demonstrate any element of incompetency, bias or prejudice in the juror *as such* to sit in judgment on the *prisoner's* case, but, such an answer from the juror would only demonstrate the ill-fortune of the prisoner in having Roe for a witness, or rather in not having some one else as a witness more credible than Roe. If the juror's want of faith in the credibility of the evidence of descendants of the Afri-

can race was attributable to race prejudice, there is still nothing in the record to show that he was incompetent to sit as a juror on the prisoner's case, because there was nothing to disclose, at the time of the juror's examination on the *voir dire*, to what class the prisoner's witnesses, if he has any, belonged, whether to the white or the African race. We are cited to the case of Pinder vs. State, 27 Fla., 370, as supportive of this assignment. In that case the question to the juror on the *voir dire* was: "Could you give *the defendant,* who is a negro, as fair and impartial a trial as you could a white man, and give him the same advantage and protection as you could a white man *upon the same evidence?*" There is no parellelity whatever between the two questions. The one quoted from the Pinder case sought to find out from the proposed juror whether he could give the negro *prisoner* the same consideration *on the same evidence* as he would give to a white man. In the case at bar the question proposed left *the prisoner* out of consideration altogether, and sought to test in advance the proposed juror's comparative faith in the evidence of *witnesses* belonging to two different races, who might or might not testify therein, and of whom, it was impossible at that stage of the proceedings, to say that either of the two classes would actually be witnesses in the cause.

The third assignment of error is, that the court erred in refusing to allow the detendant's attorney time to write out the evidence in long hand as it was given in at the trial. There was no error in this. The regula-

tion of all such matters involved in the practical con-
duct of the trial of causes, of necessity, are to be left
largely to the discretion of the trial court, to be gov-
erned by the importance of the issues, the volume,
character and import of the evidence desired to be pre-
served by transcription.   There is nothing to show
that the defendant was damnified in any way in con-
sequence of the failure of the court to delay the pro-
gress of the trial in order to have the evidence written
out at length.   On the contrary the defendant has pre-
sented us in the record with a bill of exceptions con-
taining a very voluminous and certifiedly accurate
statement of the evidence adduced at the trial, not-
withstanding the fact that his counsel were not granted
extra time pending the trial to write it out *in extenso*.

The fourth assignment of error is, that the court
ruled incorrectly in admitting a certain memorandum
book in evidence of the State's witness, R. L. Hum-
phries, who was the superintendent or foreman of the
mill that was burned; in which book he kept a memoran-
dum of the different owners, and the marks and weights
of baled cotton contained in the mill house that was
burned.   The evidence in this case was largely circum-
stantial.   One of the circumstances most potently
pointing to the defendant as the burner of the mill
was the subsequent tracing into his possession and
proof of the sale by him of a bale of cotton that was
identified by its weight and by portions of its marks
that had been left unaltered as being one of the identi-
cal bales that was in the mill house at the time this

superintendent or foreman closed up the house on the evening previous to the early burning thereof the next morning. This identification of the bale of cotton was done by the witness Humphries to whom the contested memorandum book belonged. The entries in the memorandum book enabled him to refresh his memory and more accurately to testify as to the number, weights and marks of the bales of cotton in the mill at the time of, or immediately prior to, its burning. All of which was material and pertinent to the issue under the proof. We, therefore, think that the memorandum book was properly admitted, as it seems from the record to have been, for the purpose of refreshing its owner's memory as a witness as to pertinent and material facts at issue. No other use appears to have been made of such memorandum book at the trial but to refresh the memory of the witness to whom it belonged in giving his testimony.

The fifth error assigned is the refusal of the court to strike out the evidence of one Colfax Braxton Pride, a State's witness. This witness, it appears from the record, was an accomplice of the defendant to some extent in the crime. The objections urged against his evidence are rather novel. They are, 1st, because of his manifest want of intelligence. 2nd, because it is inferable from his lack of intelligence in some things that his testimony as to other things must have been the result of coaching; and, 3rd, that the *confessions* of an accomplice are not admissible against his confed-

erates. In the first and second of these objections there is no merit. The third proposition is true that the *confessions* of an accomplice made to third persons after the completion of the offense are not permitted to be detailed by such third persons, *as confessions*, in the trial of another confederate. Anderson vs. State, 24 Fla., 139, 3 South. Rep., 884. But that proposition does not apply to this case. There was no effort here to introduce the *confessions* of an accomplice, but we have the accomplice himself on the stand as a witness testifying, (not confessing), against his confederate. That an accomplice is a competent witness, and that a conviction may be had upon his uncorroborated testimony where it satisfies the jury beyond a reasonable doubt, is settled in this State in Bacon *et al.* vs. State, 22 Fla., 51; Sumpter vs. State, 11 Fla., 247.

The sixth assignment of error is the refusal of the court to give certain instructions to the jury asked for by the defendant and numbered 1st, 2nd, 3rd, 4th, 5th, 6th, 10th, 13th and 14th.

The first of these refused instructions if proper to have been given at all, we think was substantially contained in another charge that was given, and there was, therefore, no error in its refusal. The same is true of the second instruction refused.

To have given the third refused instruction would have been an assumption by the court that there had been a commission of other crimes by the prisoner and

would have tended to his injury, and it was, therefore, properly refused.

The fourth refused instruction does not correctly state the rule as it has been recognized in this State in reference to the propriety of convictions upon the uncorroborated evidence of an accomplice alone, and was, therefore, properly refused. The fifth refused instruction was patently erroneous and was properly refused. And what is said of the fifth is also true of the sixth refused instruction. The tenth refused instruction was not good law and was properly refused. The pith of the thirteenth refused instruction, is, that the evidence, to justify conviction, must lead naturally to a reasonable and moral certainty of guilt, and not only to a probability thereof. All of which we think is substantially covered by another charge given wherein the jury were instructed that: "The defendant is presumed to be innocent, and this presumption of innocence continues until his guilt has been established by evidence to the satisfaction of the jury and beyond a reasonable doubt." The fourteenth refused instruction was not a correct proposition of law and was properly refused.

The seventh and last assignment of error is the denial of the defendant's motion for new trial. The only ground of the motion for new trial that we can properly notice is the second, *viz*: "The verdict was contrary to the evidence."

The substance of the evidence was as follows: The mill and gin house burned was located in Leon county, Florida, and was owned by T. J. Roberts. The machinery therein was propelled by steam power. It was totally destroyed by fire between 2 and 4 o'clock, or, as one witness said, about 3 o'clock on the morning of October 14th, 1892. The superintendent or foreman of the mill left the building, after locking it up and seeing the fire about the engine put out with water, about 3 or 4 o'clock on the evening previous to the fire. That night between 2 and 4 o'clock in the morning he was aroused by a boy who told him the mill was on fire. On going to the mill he found it on fire and pretty well burned down. The defendant lived near enough to the mill to hear the ring of a bell and the voices of persons hallooing. A bale of cotton, that was positively identified as being one of the bales that was locked up in the mill, with others, on the evening before the fire, was traced to the defendant's possession, and proven to have been sold the same day of the fire by one Colfax Braxton Pride who lived and worked with the defendant. Upon this bale of cotton being identified and seized by Mr. Roberts, the defendant, without any apparent demur, refunded to the party to whom Braxton Pride had sold it the money that he had paid out for it. Colfax Braxton Pride swore that at the time of the fire he lived with and worked for the defendant. That he was there on the night of the fire on October 14th, 1892. That the defendant's wife called him up in the night on that night and wanted him to go with the defendant. That he got up and went with the defendant to

Mr. Roberts' gin house, he driving a wagon and the defendant walking along by the wagon in going. That when they got to the gin house the defendant opened the door thereof, rolled out from it a bale of cotton and put it on the wagon, and told him (witness) to take it to the station and sell it, and to say that it belonged to him (witness) and defendant's wife, which he did. That when he drove off with the bale of cotton on the wagon he left the defendant standing by the gin house gate. That after he had gone about a mile, and in about twenty minutes after he had left the gin house, he saw the light of the fire back at the gin house.

In the 5th American edition, volume 1, page 447 of Starkie on Evidence, that author, in discussing circum- stantial evidence, says: "What circumstances will amount to proof can never be matter of general defini- tion; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. On the one hand, absolute metaphysical and demon- strative certainty, is not essential to proof by circum- stances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt." An appellate court, when called upon, in a criminal case, to reverse the finding of a jury upon the *facts* in evi- dence, are bound to regard every fact and circumstance adduced in proof as being true that tends to uphold the finding assailed. This follows as a necessary result of the rule that it is the jury's exclusive province to decide upon the *weight* and *credibility* to be given to

·all evidence.  With these established rules of law in mind, we find from the evidence of eye witnesses that the house burned was a gin and mill house, where ·cotton, a well-known highly and quickly inflamable material, was ginned and stored.  That the fire, used in operating the machinery in that house was put out with water and the gin house locked up, between three and four o'clock in the evening, with its contents of baled cotton.  That the defendant at a late and unusual hour of the night, between two and four o'clock *post minuit*, went to that gin house with a wagon, opened its locked door and stole therefrom a bale of cotton that he sent off by a confederate in the wagon, to be disposed of; he, the defendant, remaining behind at the gin house alone.  Within twenty minutes after the departure of his accomplice with the fruits of his theft, the fire breaks out at the gin house and is seen by the departing accomplice from the distance of a mile away.  Here we have the defendant, not from circumstances, but from direct proof by an eye witness, at a late and unusual hour of the night, present, in the character of a thief, at the house burned.  The well-known highly inflamable character of the material in and about the burned building, and the proved fact that the fire thereabout was put out with water from ten to twelve hours before, negatives the idea of the possible presence there of a smouldering, or slowly igniting fire from accident or carelessness.  Actual theft from the building by the defendant within twenty minutes before the breaking out of the fire therein, furnishes the motive on his part for the building's de-

struction to cover the discovery of that theft. His remaining there alone after sending off an evidently weak-minded accomplice in the theft, justifies the inference that he remained there alone for further crime; and that crime manifests itself, within twenty minutes, at the distance even of a mile, in the brilliant glaring of the incendiary's fire. Under all the circumstances we can not say that this proof was insufficient to satisfy the minds and consciences of the jury, to a moral certainty, of the defendant's guilt, to the exclusion of every reasonable doubt. This being so, it is beyond our province to disturb their finding.

No errors appearing in the record, the judgment of the court below is affirmed.