BENJAMIN JOSEPH THORNTON *v.* STATE OF
MARYLAND

[No. 824, September Term, 1975.]

*Decided April 13, 1976.*

The cause was argued before ORTH, C. J., and LOWE and MELVIN, JJ.

*Karl G. Feissner* and *Ronald S. Schimel, Assigned Public Defenders,* with whom were *Edward P. Camus, Public Defender for Prince George's County* and *Feissner, Garrity, Levan & Schimel* on the brief, for appellant.

*Albert Gallatin Warfield, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall Jr., State's Attorney for Prince George's County* and *Howard Shemler, Assistant State's Attorney for Prince George's County* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Appellant and a co-defendant "late of Prince George's County" were indicted for burglary, housebreaking, larceny and receiving stolen goods "at Prince George's County aforesaid." The specified "goods and chattels, monies and properties" belonged to Abraham Lincoln, from whose dwelling they were taken "on or about the 25th day of February, 1975." The jury found appellant not guilty of burglary, larceny or housebreaking, but guilty of receiving stolen goods.

On appeal, appellant argues that this conviction should be reversed on two grounds:

1) "The trial court committed reversible error when it failed to permit a question on voir dire relating to possible racial prejudice of pro- spective jurors."; and

2) "There was insufficient evidence to show that the Appellant had received stolen goods in the State of Maryland." [1]

---

1. The State indicates by brief that:
   "Although the issue has overtones of a jurisdictional attack, Appellee submits that it is more properly categorized as an evidentiary question."
   Appellant having submitted and appellee conceded it thus, we will not treat the jurisdictional aspect.

Since we agree with appellant's second contention and will reverse his conviction on that ground, we will discuss it first.

## Sufficiency of the Evidence

The evidence introduced at trial showed that appellant was seen with an acquaintance on the day following the burglary in the 3800 Block of Hayes Street, N.E., in Washington, D.C., unloading equipment that later proved to be that stolen from Lincoln's house. At the conclusion of the State's case, the appellant moved for judgment of acquittal. That motion was denied essentially because the State had proven the theft from Mr. Lincoln's household at night and the subsequent possession of the stolen property by appellant (and his co-defendant who was tried separately). The court said:

> "With respect to the principal matter raised, that of criminal agency of the Defendant, the possession of recently stolen property permits the inference in this State that the possessor is the thief. This property was stolen on the 25th and found in the Defendant's possession on the 26th."

With regard to the receiving count and the larceny count, the court simply said:

> "With respect to the incompatibility of the third [larceny] and fourth [receiving] counts, it is true of course that a conviction cannot be had on both those counts. They are mutually exclusive. However, that is once again the decision to be made by the jury and not appropriate matter for motion for determination by the Court at this point."

For purposes of the motion, the judge did not comment upon, if he then considered, what evidence there was that the stolen goods had been "received" in Prince George's County. He did, however, properly instruct the jury on that issue:

> "Now, there is in this State law which permits

you ladies and gentlemen to infer that the unexplained possession of recently stolen goods is evidence that the possessor is the thief. The testimony would seem to show that the property in this case was taken from a home in Prince George's County and subsequently recovered in the District of Columbia. It is for this reason that I explained to you that the elements must occur in Prince George's County. If you do not choose to infer that the possession indicates that the possessor was the thief, but rather that he was a receiver of these goods, and you find that the receiving occurred entirely in another jurisdiction, other than Prince George's County, then he must be acquitted of receiving. You would have to be satisfied from the evidence that the receiving occurred in Prince George's County."

Although the instruction is sound, there was not the slightest evidence upon which the jury could base its finding that the stolen goods were received in Prince George's County. Although it concedes that the prosecution presented no direct evidence establishing appellant's presence in Maryland, the State contends that, because appellant's counsel asked the arresting officer several times on cross-examination whether appellant was free to "return to Maryland," these questions "acted as an admission that appellant had recently come into the District of Columbia from Maryland."

It hardly seems necessary to note that neither arguments nor questions of counsel are evidence. Moreover, we do not see how an inference that appellant had theretofore received stolen goods in Maryland could be drawn from an indication that appellant wanted to "return to Maryland." Finally, the questions were asked out of the presence of the jury during what appears to have been a suppression hearing.

Straining mightily, the State next argues that the geographical proximity of Washington, D.C., where appellant was apprehended, to Prince George's County, from whence the goods were stolen, "supports the rational

inference that, thereafter, the goods were received by Appellant within the confines of the State." It cites *Commonwealth v. Obshatkin*, 307 N.E.2d 341 (Mass. App.) as persuasive precedent. We do not find *Obshatkin* to be either persuasive or precedent. A decision of another jurisdiction is not binding on this Court and is instructive only insofar as it deals with similar facts and is reasoned convincingly. *Obshatkin* is not convincingly reasoned, nor is it factually apposite. In that case, the Court held:

> ". . . while there was no direct testimony in the instant case that the defendant actually received the stolen property within the Commonwealth, the jury could have found from the evidence that the defendant lived in Taunton, that the goods were stolen in Taunton, and that the defendant possessed the goods in nearby Warwick shortly thereafter. From those circumstances the jury were warranted in inferring that the receipt did take place in Massachusetts. While it is true that 'possession out of the commonwealth of goods stolen in the commonwealth would not *of itself* warrant a conviction for receiving them . . . here' (Commonwealth v. Phelps, 192 Mass. 591, 593-594, 78 N.E. 741, 742 [1906]; emphasis supplied), we think that there was sufficient additional evidence presented here to warrant the defendant's conviction." 307 N.E.2d at 343.

In the instant case, there was no evidence introduced that appellant lived in Pepper Mill Village where the goods had been stolen. Indeed, there was no proof at all of his residence. Nor was there any proof offered to connect appellant with Prince George's County except the possession of goods that had been stolen there. That possession may have given rise to a logical inference that the possessor had stolen them in Prince George's County since testimony showed that situs as the scene of the theft. When the jury found that appellant had not stolen the goods and, thus, that the theft was committed by someone else, the inference was

that he was a receiver of stolen goods, *Jordan v. State*, 219 Md. 36, 46, but there was *no* evidence from which it could be inferred that his receipt of the goods occurred in Prince George's County. To the contrary, his possession of them, to the extent proven, was shown to be solely in Washington, D. C. which gives rise to the opposite inference. We must, therefore, reverse the conviction.

Because we remand this case for retrial subject to the holding in *Gray v. State*, 254 Md. 385, we will respond to appellant's second question which may again arise if he is retried.

### Racial Prejudice Inquiries on Voir Dire

Until the middle of the twentieth century, this country (as was said of M. de Lessay [2]) flattered itself on being without prejudice. In 1954, the Supreme Court abruptly ended this delusion by demonstrating that our pretension was itself a very great prejudice.[3] A conscience-piqued nation then began an honest and intense self-evaluation in an effort to recognize and discard prejudices, especially racial ones, within ourselves and inherent within our judicial system. The pendulum of national awareness of our racial prejudices, once jarred loose from its extreme position of obscurity, began its swing to the opposite extreme where its new visibility would cause it to become the focal point of our national conscience.

In 1959, as the pendulum started its swing, the Court of Appeals heard the appeal of Johnnie Brown, a black man who had never been in trouble with the law until, on September 5, 1958, he shot a white policeman (who had arrested him on a charge of uttering bad checks) in the back. The case was removed from Salisbury, Maryland where the crime occurred, to Dorchester County.

At his trial, Brown proffered a series of questions to be

---

**2.** Anatole France, *The Crime of Sylvestre Bonnard*, Ch. 4.
**3.** In Brown v. Board of Education of Topeka, 347 U. S. 483, the Court recognized that the doctrine of separate but equal espoused in Plessy v. Ferguson, 163 U. S. 537, had no place in public education.

asked prospective jurors. Among these questions were several seeking to ascertain

> ". . . whether the jurors had any prejudice against a Negro which would prevent them from giving a Negro as fair and impartial a trial as they would a white man. Question ten, for example, was: 'Can you, without bias or prejudice, pass your verdict in this case solely on the evidence produced from the witness stand without regard to the race, creed or color of the Defendant?' " *Brown v. State,* 220 Md. 29, 33-34.

On Brown's appeal from his conviction, he took issue with the trial court's refusal to include such questions in the voir dire examination of prospective jurors. The Court found that:

> "Although some courts have found no error in refusal to question prospective jurymen as to such prejudice, the majority, and we think the far better reasoned, of the cases, holds to the contrary." *Id.* at 34.

Quoting from the opinion in *State v. Higgs,* 120 A. 2d 152 (Conn.), Judge Hammond reasoned for the Court that:

> " 'In line with this thought, it is almost uniformly held in other jurisdictions that it is reversible error in a criminal case in which a Negro is the defendant to exclude questions, propounded by him on the voir dire, designed to bring out that a prospective juror is so prejudiced against the Negro race that it would take less evidence to convince him that a Negro was guilty of the crime charged than to convince him that a white person had committed a similar crime. . . .
>
> 'We cannot be blind to the fact that there may still be some who are biased against the Negro race and would be more easily convinced of a Negro's guilt of the crime of rape than they would of a white man's guilt. . . .

'So long as race prejudice exists, even in a relatively few persons, there is a substantial chance that one of those few will appear in court as a venireman. Consequently, the fact that most people in the state are not prejudiced against Negroes is not of controlling importance.' " *Id.* At 35.

Judge Hammond also relied upon language of the Supreme Court in *Aldridge v. United States*, 283 U. S. 308, to emphasize that the required question was not aimed at revealing the dominent sentiment of the community, see *Smith and Nelson v. State*, 12 Md. App. 130, but at revealing the bias of the particular jurors who were to try the accused:

" 'If in fact, sharing the general sentiment, they were found to be impartial, no harm would be done in permitting the question; but if any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit. * * * we do not think that it can be said that the possibility of such prejudice is so remote as to justify the risk in forbidding the inquiry. And this risk becomes most grave when the issue is of life or death.' " *Brown v. State*, 220 Md. at 36.

Then presumably to point out that this view was not of recent vintage based on the tenor of the times, Judge Hammond pointed out that:

"In *Lee v. State*, 164 Md. 550, 556, there was at least an implication that the accused would have been entitled to have asked the questions that the appellant here requested." *Id.* at 36.

Finally, and most conclusively, the Court stated:

"We hold that the failure to elicit from the jurors the essence of the information sought by the appellant was reversible error." *Id.* at 36.

Two years later, in *Contee v. State*, 223 Md. 575, wherein a black man appealed his conviction of raping a white woman,

the Court went even further. In that case, the lower court had rejected six questions, all proffered by appellant in an apparent attempt to ascertain racial prejudice of prospective jurors. In spite of the fact that the questions were so improperly couched that they

> ". . . all appear[ed] to be examples of what not to request the court to propound to prospective jurors on *voir dire* in a case of this type which is likely to have aroused some racial feelings in the community where it is to be tried." 223 Md. at 580,

the Court reversed the conviction below, observing that the trial court "had no intention of making any inquiry as to whether the jurors could or would set aside the feelings he or she might have as to racial differences and fairly and impartially decide the case solely on the evidence and the applicable law." *Id.* at 581. The Court went well beyond the ruling in *Brown v. State, supra,* and held:

> ". . . that where, as here, a defendant is denied the opportunity of submitting or requesting proper questions relating to racial bias or prejudice to be propounded by the court to prospective jurors on *voir dire,* such denial constitutes reversible error." 223 Md. at 581.

While recognizing the importance of protecting defendants against racially prejudiced jurors, in *Humphreys v. State,* 227 Md. 115, also an appeal from the conviction of a black man of the rape of a white woman, there is language indicating that the right to question veniremen as to racial bias is not an absolute which is available to all black defendants. Rather, it is only mandated

> ". . . where prejudice against the Negro race may be a factor in determining a prospective juror's attitude toward a particular defendant. . . ." *Humphreys, supra,* 227 Md. at 118.

Similarly, the Court in *Contee, supra,* at 580, recognized that:

> ". . . a case of this type . . . is likely to have aroused

some racial feelings in the community where it is to be tried."

In summary, Maryland seems to require the interrogation of veniremen with respect to racial prejudice upon request,

1) where racial prejudice may be a factor because of the facts of the case, but

2) no specific question or procedure is compelled so long as the "essence" of the information sought as to prejudice is inquired into.

Notwithstanding the fact that Judge Hammond had *Aldridge v. United States, supra,* to guide him in *Brown v. State,* and obviously followed the Supreme Court's views therein, it is equally apparent that the Court of Appeals did not feel *bound* by *Aldridge,* since only passing reference is made to it in the *Brown* decision. Both Aldridge and Brown were black defendants charged with killing white policemen. Both of their convictions were reversed in opinions holding that essential elements of fairness require voir dire inquiry as to racial prejudice under the circumstances of the case. However, had the Court of Appeals considered *Aldridge binding* under the Fourteenth Amendment, there would have been little need to cite authority from the State of Connecticut to bolster its holding in *Brown.*

The misconception which prevailed in Maryland as to the effect of Supreme Court rulings on state criminal procedure was shared by other jurisdictions. It was not until 1973 that the Supreme Court finally held in *Ham v. South Carolina,* 409 U. S. 524, that the Fourteenth Amendment requires states having statutory framework permitting challenges for cause and voir dire examination of potential jurors, to permit an accused to have the jurors interrogated on the issue of racial bias. 409 U. S. at 527. The defendant in *Ham* was a young, black, civil rights activist who was convicted of possession of marijuana.

As is often the case, we find that the holdings of the Maryland Courts have anticipated the direction later taken by the Supreme Court. On March 3, 1976, in *Ristaino v.*

*Ross*, 424 U. S. 589, 18 Cr. L. 3082, the Supreme Court decided that the *Ham* requirement was not absolute but applicable only when there is an element in the case which raises the possibility that racial considerations could play a role in the jury's deliberations. In *Ristaino*, the defendant was a black man charged, among other offenses, with assault and battery with intent to murder a white security guard. The Court said:

> "The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him. *Ham, supra*, at 527-528. *Voir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' *Connors v. United States*, 158 U. S. 408, 413 (1895); see *Ham, supra*, at 527-528; *Aldridge v. United States*, 283 U. S. 308, 310 (1931). This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.' *Rideau v. Louisiana*, 373 U. S. 723, 733 (1963) (Clark, J., dissenting). Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant. *Ham, supra*, at 527-528.

> In *Ham*, however, we recognized that some cases may present circumstances in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during *voir dire*." (Footnote omitted). *Ristaino*, 18 Cr. L. at 3084.

This is precisely the limitation which may be found in the Maryland case law. See *Humphreys* and *Contee*, both *supra*. In the absence of some special circumstance warranting an inquiry as to racial prejudice, such examination is not mandated. To hold otherwise would allow the defendant in

every case to bypass the discretion of the trial judge and use a blind scatter shot in hopes of having a pellet find some degree of prejudice in a prospective juror.

Charles P. Curtis, in *A Commonplace Book,* remarked that "Bias and prejudice are attitudes to be kept in hand, not attitudes to be avoided." It is the circumstances of the case which cause dormant prejudices to stir. To require a prospective juror under oath to say he is without prejudice would indeed leave us with a dearth of honest venire persons or, possibly, only with jurors who are too insensitive to recognize their own biases.

Parenthetically, we note that the right to question prospective jurors as to racial prejudice is not unique to the black defendant. *Cf. Aldridge v. United States, supra,* 283 U. S. at 313. Circumstances may exist whereby a white defendant could be jeopardized by the unchecked prejudice of a black juror. Considering the amalgam of minorities which constitute our juries, if Maryland requirements were not subject to a *Ristaino* limitation, a voir dire racial prejudice inquiry would be mandated in every case. It is thus apparent why Maryland, like the Supreme Court, holds that whatever the ethnic background of the accused, he or she is not entitled to promiscuously probe for racial prejudice absent circumstances in the case warranting such inquiry. *Ristaino, supra,* at 3084.

### The Case Under Consideration

The appellant in the case at bar is a black man. The only two witnesses who testified on behalf of the State, including the victim, were also black.[4] The defendant chose not to

---

4. Colloquy during voir dire indicated that only one prospective witness was white, a Prince George's County investigating officer, and the record reveals that he was not called,

"MR. FEISSNER: The Defendant respectfully excepts to your failure to ask questions 5, 8, 9 and 11 of the proposed voir dire of the Defendant, and question number 12 which we gave you orally in chambers which would read as follows:

'Would any member not believe a witness because that witness was black?'

MR. SHEMLER: For the record, I would point out that all of the

testify. The proposed question which the judge refused to ask of potential jurors was:

> "Would any member not believe a witness because that witness was black?"

The question at issue in *Ristaino, supra*, was:

> "Are there any of you who believe that a white person is more likely to be telling the truth than a black person?" 18 Cr. L. at 3082, n. 1.

In this case, there was no possibility that racial bias would influence the outcome since the defendant, victim and only other witness were all black. Here, as in *Ristaino*:

> "The circumstances . . . did not suggest a significant likelihood that racial prejudice might infect [the] trial. This was made clear to the trial judge when [the accused] was unable to support his motion concerning *voir dire* by pointing to racial factors such as existed in *Ham* [and *Brown*, etc.] or others of comparable significance. In these circumstances, the trial judge acted within the Constitution in determining that the demands of due process could be satisfied by his more generalized but thorough inquiry into the impartiality of the veniremen." 18 Cr. L. at 3085.

We do not reach the collateral issue of whether the question appellant sought to ask jurors in the instant case was improper under *Lee v. State*, 164 Md. 550, since we hold that no question as to racial bias, either towards the defendant or witnesses, was proper under the circumstances of this case. We note, however, that the holding in *Lee*, based on the propriety of the question itself, has never been overruled by the Court of Appeals. In *Lee v. State, supra*, relied upon as implicit authority by Judge Hammond

---

State's witnesses are black except for the Prince George's County Detective who is white, and he was not an eyewitness to this offense. He was just the investigating County Police Officer.

THE COURT: Very well, you have your exception."

for his holding in *Brown v. State, supra,* one of the questions at issue was:

> " 'Would you believe a colored man's story just as quickly as a white man's?' " 164 Md. at 556.

The *Lee* Court noted that there was a "vast difference" between that question and an inquiry as to whether a juror has any prejudice against a "negro, as a negro, that would induce you to return a verdict on less or slighter evidence than you would return a verdict of guilty against a white man under the same circumstances." The Court explained that:

> "Credibility does not depend on the color of the witness, and a juror may disbelieve a witness no matter what his race." 164 Md. at 556.

The Court then concurred in the ruling of the trial judge that the question was " 'too general'." In affirming the trial court's denial of the proffered voir dire, the Court of Appeals also noted that the very

> ". . . question as asked has been held to be an improper test. *Jenkins v. State,* 31 Fla. 196, 12 So. 677; *State v. Dyer,* 154 La. 379, 97 So. 563; *State v. Buford,* 158 Iowa, 173, 139 N. W. 464; *State v. Bethune,* 93 S. C. 195, 75 S. E. 281; *Cavitt v. State,* 15 Tex. App. 190. See note, 73 A.L.R. 1209." *Id.* at 556-557.

Opinions of our own Court have also dealt with questions aimed at eliciting racial prejudice from prospective jurors. In *Smith and Nelson v. State, supra,* we held that the failure to permit the question,

> " 'Would the fact that the accused is a Negro or black, affect the ability to pass fairly on the innocence of the accused?' ", 12 Md. App. at 131,

was reversible error. Two months later, in *Tunstall and Alton v. State,* 12 Md. App. 723, we reversed the conviction of an appellant who was not allowed to pose a question to

prospective jurors, strictly on the authority of *Smith, supra.* However, the question in *Tunstall* didn't seek to elicit prejudice as influencing a finding of guilt or innocence, but instead asked:

> " 'Would you be more likely to believe a white witness rather than a Negro witness?' " 12 Md. App. at 726.

Without referring to the *Lee* holding, and without the clarity of *Ristaino* to guide us, in *Tunstall* we stated:

> "We think that the question strikes at the very heart of racial prejudice. The Appellants were entitled to have excluded from the jury those persons who would believe the testimony of one witness as true, in preference to another because of the pigmentation of the skin of the witness." *Tunstall, supra,* at 727.

Because we found that the trial judge had not covered the subject of racial prejudice in any manner, we reversed without any reference to whether racial prejudice appeared as a factor from the circumstances of the case, *Humphreys, supra;* or as likely to arouse some racial feelings in the community where tried, *Contee, supra;* or whether the circumstances suggested a significant likelihood that racial prejudice may infect the trial, *Ristaino v. Ross,* 18 Cr. L. at 3085.

Because of the brevity of our holding on the issue of prejudice, *Tunstall* may be construed to stand for the proposition that *whenever* any question as to racial bias is proffered upon voir dire, it *must* be asked.

> "The proposed question was directed specifically to a harboring of racial prejudice. Failure to ask it on *voir dire* is reversible error." *Id.* at 727.

To the extent that *Tunstall* "announce[d] a requirement of universal applicability," *Ristaino, supra,* we limit it as the Supreme Court limited *Ham.* In doing so, we qualify that holding for precedential purposes to conform to limitations

implicit in the holdings of the Court of Appeals in *Humphreys* and in *Contee*, both *supra. Tunstall*, like *Ham*:

> "... did not announce a requirement of universal applicability. Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand] unsworne.'" (Footnote omitted.) *Ristaino v. Ross*, at 3084.

To hold otherwise would provide a trap for an unwary trial judge when, as here, the circumstances show that no question of prejudice is apparent nor likely to arise. Asking the question might very will rekindle a dormant spark of prejudice, the fire of which had all but died, and thus enure to the detriment of the defendant who asked. An assessment of the circumstances in the case here on appeal does not indicate that there was a constitutionally significant likelihood that racial prejudice might be a factor in the jury's decision.

Having completed its full swing, the pendulum has found its proper position between the two extremes of complete indifference and oversensitivity to possible racial prejudice.

*Judgment reversed.*
*Case remanded for retrial.*