742 A.2d 952

Jorge **HERNANDEZ**

v.

**STATE of Maryland.**

**No. 40, Sept. Term, 1999.**

Court of Appeals of Maryland.

Dec. 21, 1999.

Daniel H. Weiss, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Sarah Page Pritzlaff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

The petitioner, Jorge Hernandez (Hernandez), was convicted in the Circuit Court for Montgomery County of child abuse and second degree rape. At trial Hernandez testified in Spanish, through an interpreter. Hernandez here contends that the trial court improperly refused to propound his requested *voir dire* question sixteen, reading, "Is there any

member of the panel who would be prejudiced against a defendant because of any defendant's race, color, religion, sexual orientation, appearance, or sex?" As more fully explained below, because prejudice based on race was raised by the request, but the trial court did not inquire specifically as to that possible bias, we shall order a new trial.

The State proved that Hernandez had vaginal intercourse with the then nine year old daughter of the woman with whom he lived. Hernandez testified that, in 1990, he came to the United States from El Salvador where he had been raised and that he speaks English poorly. In this Court, he describes the victim as Hispanic.

The Spanish interpreter who assisted Hernandez throughout the trial was introduced to the prospective jurors prior to the *voir dire,* as was Hernandez. In its opening remarks to the venire, the court said:

"What we are looking for is jurors who will approach this case with an open mind, and who are willing to listen closely to all of the evidence presented by either side. We are looking for jurors who will render a fair and impartial verdict based on the evidence presented in this courtroom and the law as it pertains to this case. Jurors must be as free as humanly possible from prejudice, sympathy, and preconceived ideas for or against either party."

The court also asked whether any of the prospective jurors "have any bias or prejudice either for or against the defendant."

Later in the *voir dire* process, during a bench conference, the following exchange occurred:

"[Defense Counsel]: Also [Question] No. 16 the defendant because of his race, color, religion, sexual orientation?

"The Court: I already asked them if there was any reason—do you have any bias or prejudice either for or against the defendant? I think that has been covered.

"[Defense Counsel]: That is okay. I am just checking."

After discussing other voir dire questions, the prosecutor returned to the proposed question on bias, raising concerns about question sixteen:

"[Prosecutor]: If I can say one thing, Your Honor, this is out of an abundance of caution. I think I have seen some cases that dealt with No. 16 basically saying [that] if they ask, they shall receive. I know your Honor asked a broader question, but ... just so there is not an issue at all, I would urge the Court to go ahead and ask No. 16 in terms of *the racial question.* I think I have seen an appellate opinion to do with voir dire on that, and that makes me a little bit nervous.

"The Court: Well I—

"[Prosecutor]: I know you asked it in a general sense of bias, but I think this might help to be a little more specific just to insulate the record. Maybe you could throw in against the defendant or the witness. I mean, *you could put the race* on the other side also.

"The Court: Well, I have already asked them, Do you have any bias or prejudice either for or against the defendant? And what you are asking me to do is ask the question, 'Is there anybody who would be prejudiced against the defendant because of his race, color, religion, sexual orientation'?

"[Prosecutor]: I am not saying you should have to. I am just saying out of an abundance of caution.

"The Court: I think it is clearly covered." (Emphasis added).

Three months after the jury found Hernandez guilty, his motion for a new trial was heard. While conceding that "[question sixteen] may not be the most artfully drafted question," Hernandez argued that it sufficiently "touch[ed] on the key issue ... [of] racial prejudice." He submitted that, under Maryland law, when "the judge is asked to do something along specifically racial grounds, there is no more ... discretion. It is something that has to be done." He did not believe, however, that "it goes so far [as] to say, 'Is anyone

prejudiced against African Americans or Hispanic or anything like that.' "

It was at this argument on the motion for a new trial that Hernandez was first expressly referred to as being of the "Hispanic" race. That reference was by the State. Basically, the State argued that an accused ordinarily is entitled to a *voir dire* question directed to the race of the accused only if the accused "claims meaningful ethnic differences between himself and the victim." That rule, the State submitted, did not apply to the prosecution of Hernandez, because

> "what you have in this case was a complete hodge-podge when you talk about the racial components of this case. The State called black witnesses, white witnesses, Hispanic witnesses—the victim and the eye witness being Hispanic. The defense called Mr. Hernandez, called some coworkers that were Hispanic, called coworkers that were white. I mean, we were all over the place in terms of the racial mix. And it is kind of an offensive notion to have to delve into that, because ... there is no evidence of racial prejudice [creeping] in."

The judge denied the motion on the ground that potential prejudice was adequately covered by the questions asked.

On appeal, Hernandez raised, among other issues, whether "the trial court err[ed] by refusing to propound a requested question on *voir dire* relating to racial bias." In an unreported opinion, the Court of Special Appeals affirmed. That court noted that, although "[i]t would be an abuse of the court's discretion to fail when requested to propound a question regarding racial bias," it is not an abuse of discretion "if the substance of the information sought by the defense is fairly covered by another question asked by the court." The court held that "the measures taken by the [trial] court, considering the identification of the defendant and use of an interpreter, sufficiently covered the substance of [Hernandez's] proposed instruction."

Hernandez petitioned this Court for a writ of certiorari, framing the question presented as whether "a non-specific

question regarding bias [is] sufficient *voir dire* in the trial of a Hispanic defendant when both the defense and the prosecution request that the court propound a specific question designed to elicit racial bias?" We granted the writ. *Hernandez v. State*, 354 Md. 570, 731 A.2d 969 (1999).

In this Court, Hernandez contends that "[t]he *voir dire* inquiry proposed by the defense was directed to a specific cause for disqualification, bias against an Hispanic defendant on account of his race." Alternatively, he contends that, under *Contee v. State*, 223 Md. 575, 165 A.2d 889 (1960), the trial court erred by not itself formulating a proper question. On the other hand the State contends that the circumstances of this particular case do not require a *voir dire* question concerning prejudice against Hispanic persons and that the questions actually asked were sufficient. The State does not directly challenge Hernandez's assumption that Hispanic persons comprise or are recognized as an identifiable race.

The contentions of both parties are best answered by reviewing the evolution of federal and Maryland law on *voir dire* concerning racial prejudice.

## I

### A. Federal Case Law

At the federal level, the development of *voir dire* with respect to the issue of race began in *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). In that capital case, the Court reversed the conviction by a white jury of an African–American man, who had been found guilty of shooting a white police officer, because the trial court had refused the defendant's request to propound a "question relative to racial prejudice." *Id.* at 310, 51 S.Ct. at 471, 75 L.Ed. at 1056. Speaking in the language of its time, the Court reasoned that:

"But the question is not as to the civil privileges of the negro [such as serving on juries, permitted at that time in the District of Columbia], or as to the dominant sentiment of the community and the general absence [therein] of any

disqualifying prejudice, but as to the bias of the particular jurors who are to try the accused. . . . [I]f any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit. Despite the privileges accorded to the negro, we do not think that it can be said that the possibility of such prejudice is so remote as to justify the risk in forbidding the inquiry."

*Id.* at 314, 51 S.Ct. at 473, 75 L.Ed. at 1058 (footnote omitted). Thus, the "essential demands of fairness" required the trial court to propound the requested question in light of the non-remote possibility of disqualifying prejudice in the individual members of the jury. *Id.* at 310, 51 S.Ct. at 471, 75 L.Ed. at 1056.

In *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Court, noting that *Aldridge* "was not expressly grounded upon any constitutional requirement," first addressed a requested, race-oriented *voir dire* question as a constitutional issue. *Id.* at 526, 93 S.Ct. at 850, 35 L.Ed.2d at 50. In that case, a South Carolina jury convicted an African–American man of possession of marijuana; the defendant, who asserted that he had been framed by the police in retaliation for his civil rights activity, requested two *voir dire* questions that "sought to elicit any possible racial prejudice against Negroes." *Id.* at 525, 93 S.Ct. at 850, 35 L.Ed.2d at 49. The trial judge refused to propound these questions on the ground that this issue was covered by more general questions.[1] The Supreme Court reversed. Noting that one

---

1. The defendant had requested the trial court to ask, among others, these two questions: (1) "Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?"; and (2) "You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term 'black'?" *Ham*, 409 U.S. at 525 n. 2, 93 S.Ct. at 849 n. 2, 35 L.Ed.2d at 49 n. 2. Instead, the judge asked the following "three general questions as to bias, prejudice, or partiality" that were specified by state statute: (1) "Have you formed or expressed any opinion as to the guilt or innocence of the defendant, Gene Ham?"; (2) "Are you conscious of any bias or prejudice for or against him?"; (3) "Can you give the State and the defendant a fair and

purpose of the Due Process Clause is, in the language of *Aldridge*, "to insure these 'essential demands of fairness,'" and that the "Fourteenth Amendment was [adopted] to prohibit the States from invidiously discriminating on the basis of race," the Court held that constitutional due process requires that "under the facts shown by this record the petitioner be permitted to have jurors interrogated on the issue of racial bias." *Id.* at 526–27, 93 S.Ct. at 850, 35 L.Ed.2d at 50. By reversing the conviction, the Court indicated that, despite its recognition of a trial judge's broad discretion as to the number and form of *voir dire* questions, the more general questions propounded by the South Carolina trial court failed adequately to address the issue of racial bias.

Three years later, the United States Supreme Court limited the reach of *Ham* to cases in which the circumstances of the crime "suggest a significant likelihood that racial prejudice might infect [a defendant's] trial." *Ristaino v. Ross*, 424 U.S. 589, 598, 96 S.Ct. 1017, 1022, 47 L.Ed.2d 258, 265 (1976). In *Ristaino*, the Court upheld the conviction of an African-American defendant for the assault and battery and armed robbery of a white security guard. The trial judge had propounded general questions on bias, which resulted in the elimination of one veniremember for racial prejudice, but had denied the defendant's request that the venire "be questioned specifically about racial prejudice." *Id.* at 590, 96 S.Ct. at 1018, 47 L.Ed.2d at 261. The Court asserted that "*Ham* did not announce a requirement of universal applicability," but instead applies when "under all of the circumstances presented there [is] a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand] unsworne.'" *Id.* at 596, 96 S.Ct. at 1021, 47 L.Ed.2d at 264 (alteration in original) (quoting *Coke on Littleton* 155b (19th ed. 1832)). By contrast to *Ham*, which involved a civil rights worker whose defense of police retaliation was "likely to intensify any prejudice that

impartial trial?" *Id.* at 526 & n. 3, 93 S.Ct. at 850 & n. 3, 35 L.Ed.2d at 49 & n. 3.

individual members of the jury might harbor," *Ristaino* involved "[t]he mere fact that the victim of the crimes alleged was a white man and the defendants were Negroes." *Id.* at 597, 597, 96 S.Ct. at 1021, 1022, 47 L.Ed.2d at 264, 265. According to the *Ristaino* Court, this fact was not sufficient to require, as a constitutional matter, that a requested *voir dire* question on the issue of racial bias be propounded to the venire panel.

Despite the assertion that *Ham* had not announced a rule of universal applicability, the *Ristaino* Court's reasoning indicated a narrowing of precedent. *Ham* articulated the principle that, if a juror is racially biased, then the jury's decision cannot be impartial. This principle implies that a requested, racially specific *voir dire* question is warranted, so long as there is a non-remote possibility that a juror could be biased, regardless of the circumstances of the case. By contrast, *Ristaino*'s decision that a trial judge is required to grant a racially specific *voir dire* question only under special circumstances implies that a juror could "harbor" prejudice, but that this prejudice would only become operative if the facts of the case were likely "to intensify" that prejudice. In other words, the *Ristaino* Court viewed racial prejudice as a latent attitude that becomes effective only under particular, racially-charged circumstances.[2]

In 1981, as a matter of federal common law, a plurality of the United States Supreme Court opined that a *voir dire* question directed specifically at racial bias should be required "in certain circumstances in which such an inquiry is not constitutionally mandated." *Rosales–Lopez v. United States,* 451 U.S. 182, 190, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22, 30 (1981) (plurality opinion).[3] In that case, the Court upheld the

---

**2.** Even so, however, the *Ristaino* Court stated in dicta that "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant." *Id.* at 597 n. 9, 96 S.Ct. at 1022 n. 9, 47 L.Ed.2d at 265 n. 9.

**3.** Prior to *Rosales–Lopez,* the Fourth Circuit had held that a federal district judge's refusal to propound such a question constituted per se

conviction of a man "of Mexican descent" for illegally trans-
porting aliens across the Unites States border.   The trial
court had refused the defendant's request to ask prospective
jurors if they would " 'consider the race or Mexican descent of
[the defendant] in [their] evaluation of this case.' "   *Id.* at 185,
101 S.Ct. at 1633, 68 L.Ed.2d at 26.   Although the "indications
of the likelihood of racial or ethnic prejudice" were not sub-
stantial enough to "amount to an unconstitutional abuse of
discretion," *id.* at 190, 101 S.Ct. at 1635, 68 L.Ed.2d at 29, the
plurality would require the *voir dire* question as a matter of
federal common law when there is a " 'reasonable possibility'
that racial prejudice would influence the jury." *Id.* at 192, 101
S.Ct. at 1636, 68 L.Ed.2d at 31.   The plurality noted that this
is always so when a violent interracial crime is involved, but
that it was not so in the case of the "victimless crime[ ][of]
aiding members of [the defendant's] own ethnic group to gain
illegal entry into the United States." *Id.* The plurality seemed
to reject a rule of per se harmful error on the ground that
determining the nonconstitutional standard of mandatory *voir
dire* questions "involv[es] the [issue of the] appearance of
justice in the federal courts," and that "requiring an inquiry in
every case is likely to create the impression 'that justice in a
court of law may turn upon the pigmentation of skin [or] the
accident of birth.' "   *Id.* at 190, 101 S.Ct. at 1635, 68 L.Ed.2d
at 30 (last alteration in original) (quoting *Ristaino,* 424 U.S. at
596 n. 8, 96 S.Ct. at 1021 n. 8, 47 L.Ed.2d at 264 n. 8).

■ In summary, under current federal law, a defendant
has a Fourteenth Amendment right to have a trial court
propound a requested *voir dire* question, specifically directed
to uncovering racial bias, if the case involves special circum-
stances, of the sort in *Ham,* in which "racial issues [are]

---

reversible error under *Aldridge.   See United States v. Gore,* 435 F.2d
1110, 1111 (4th Cir.1970) (reversing the conviction of African–Ameri-
can defendants whose requested *voir dire* question on racial bias had
been denied, and stating that *Aldridge* "lay[s] down a broad rule that in
any criminal case an accused has a right to inquire whether racial
prejudice precludes any juror from reaching a fair and impartial
verdict").

'inextricably bound up with the conduct of the trial.'" *Rosales–Lopez,* 451 U.S. at 189, 101 S.Ct. at 1635, 68 L.Ed.2d at 29 (quoting *Ristaino,* 424 U.S. at 597, 96 S.Ct. at 1021, 47 L.Ed.2d at 264). Moreover, a defendant has a nonconstitutional right in a federal criminal trial to have such a question propounded when there is a " 'reasonable possibility' that racial prejudice would influence the jury." *Id.* at 192, 101 S.Ct. at 1636, 68 L.Ed.2d at 31.

## B. Maryland Case Law

From a rule that apparently universally required *voir dire* inquiry into racial prejudice, Maryland law moved to a limitation on the rule to cases in which racial bias is more likely to be an issue. This Court's most recent decision, however, in *Hill v. State,* 339 Md. 275, 661 A.2d 1164 (1995), returns to a more expansive rule.

In *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959), the Court reversed the conviction of an African–American defendant for shooting a police officer because the trial court had refused "to ask any [of the requested] questions as to the bias or prejudice which jurors might have as to a Negro, and as to whether the jury could give the defendant as fair and impartial a trial as they could a white man." *Id.* at 34, 150 A.2d at 897. Relied upon was the reasoning of *State v. Higgs,* 143 Conn. 138, 120 A.2d 152 (1956), a case involving the alleged rape of a white woman by an African–American man, which held that the state constitutional right to trial by an impartial jury required that, "if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice." *Brown,* 220 Md. at 35, 150 A.2d at 897–98 (internal quotation marks omitted) (quoting *Higgs,* 120 A.2d at 154). The Court also relied upon the similar reasoning of *Aldridge,* which conceived the issue "not as ... [turning on] the dominant sentiment of the community and the general absence of disqualifying prejudice, but ... [on] the bias of the particular jurors who were to try the accused." *Brown,* 220

Md. at 35–36, 150 A.2d at 898. Thus, *Brown* required a trial judge to propound a criminal defendant's requested *voir dire* question when it was designed to uncover racial bias "[s]o long as race prejudice exists, even in a relatively few persons." *Id.* at 35, 150 A.2d at 898 (internal quotation marks omitted) (quoting *Higgs*, 120 A.2d at 154).

In *Contee v. State*, 223 Md. 575, 165 A.2d 889 (1960), an African–American man was convicted of raping a white woman. The conviction was reversed because, under circumstances described in Part II, *infra*, the trial court should have asked "a proper question designed to ascertain the existence of cause for disqualification on account of racial bias or prejudice." *Id.* at 580, 165 A.2d at 893. Although we characterized this case as one "likely to have aroused some racial feelings," *id.* at 580, 165 A.2d at 892, nothing in the reasoning of *Contee* suggested that *Brown*, on which *Contee* relied, was limited to cases of this nature.

*Humphreys v. State*, 227 Md. 115, 175 A.2d 777 (1961), also involved the conviction of an African–American man for raping a white woman. The trial court propounded four of the defendant's requested *voir dire* questions, which asked specifically about "prejudice against the Negro," but refused to propound even more specific questions concerning prejudice with respect to the rape of a white woman by an African–American. *Id.* at 119, 175 A.2d at 778–79. The Court held that, even if such specific questions were required, the overall context—including the introduction of the defendant at trial to the jurors, the statement of the charge at the beginning of the case, and the actually propounded *voir dire* questions concerning racial prejudice—was such that "the jurors could not fail to understand … that the case involved the rape of a white woman by" an African–American defendant. *Id.* at 120, 175 A.2d at 779. Although we characterized the rule in *Contee* and *Brown* to mean that inquiry into racial prejudice is proper "in a case where prejudice against the Negro race may be a factor in determining a prospective juror's attitude toward a particular defendant," *id.* at 118, 175 A.2d at 778, this case did

not expressly require that such an inquiry be limited to this type of situation.

Indeed, ten years later, in *Tunstall v. State,* 12 Md.App. 723, 280 A.2d 275 (1971), the court reversed the conviction of two African–American defendants for armed robbery on the ground that the trial judge refused to propound the requested *voir dire* question concerning whether a juror would "be more likely to believe a white witness rather than a Negro witness?" *Id.* at 726, 280 A.2d at 277. The court did so without identifying the race of the victim(s) or the witness(es), and without identifying any particular, racially-charged circumstance that would warrant the requested *voir dire* question. *Id.* at 726–27, 280 A.2d at 277.

Subsequent to *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), however, the Court of Special Appeals began to limit the application of the rule first articulated in *Brown.* In *Thornton v. State,* 31 Md.App. 205, 355 A.2d 767 (1976), the court overturned the conviction of an African–American defendant for receiving stolen goods on a ground unrelated to a requested *voir dire* question. Nonetheless, the court addressed the defendant's requested question, concerning whether a juror would "not believe a witness because that witness was black." *Id.* at 217, 355 A.2d at 773. The court reasoned that, in light of the United States Supreme Court's decisions in *Ham* and *Ristaino,* and in light of the Court of Appeals' language, noted above, in *Humphreys* ("where prejudice against the Negro race may be a factor") and in *Contee* ("a case of this type ... is likely to have aroused some racial feelings"), then "[i]n the absence of some special circumstance warranting an inquiry as to racial prejudice, such examination is not mandated." *Id.* at 215, 355 A.2d at 773. Explicitly limiting *Tunstall,* the Court of Special Appeals concluded that "[i]t is the circumstances of the case which cause dormant prejudices to stir." *Id.* at 216, 355 A.2d at 773. This reasoning comports with the view implicit in *Ristaino,* that a juror could "harbor" prejudice, but that this prejudice would only become operative if the facts of the case

were likely "to intensify" that prejudice. *See Ristaino,* 424 U.S. at 597, 96 S.Ct. at 1021, 47 L.Ed.2d at 264.

Similarly, in *Holmes v. State,* 65 Md.App. 428, 501 A.2d 76 (1985), *rev'd on other grounds,* 310 Md. 260, 528 A.2d 1279 (1987), the Court of Special Appeals noted that "special circumstances warranting *voir dire* as to racial bias must exist before such examination is mandated." *Id.* at 438, 501 A.2d at 80–81. Reviewing previous cases, the court found that these special circumstances exist when "the issue of racial prejudice [is] fairly generated," and that this occurs "when the complainant and the witnesses for the State are of a different race than the defendant, and the crime involves victimization of another person and the use of violence." *Id.* at 438–39, 501 A.2d at 81 (footnote omitted).

This Court rested its rationale heavily on special circumstances in *Bowie v. State,* 324 Md. 1, 595 A.2d 448 (1991). There we reversed the conviction of an African–American defendant for first degree murder and other charges because the trial court had refused to propound a racially specific *voir dire* question. Citing *Holmes,* we then stated:

"[I]t is patent that the trial court erred in refusing to inquire concerning possible racial prejudice. All but one of the victims and most of the witnesses for the State were white. On the other hand, appellant is an African–American. Moreover, this case involves the violent victimization of other persons. Consequently, under our cases, inquiry into juror racial bias should have been made."

*Id.* at 15–16, 595 A.2d at 455.

Thus, at the time of *Bowie,* this Court's jurisprudence was consistent with that of the United States Supreme Court. That Court has noted, however, that "[t]he States . . . are free to allow or require [*voir dire* ] questions not demanded by the [United States] Constitution." *Ristaino,* 424 U.S. at 597 n. 9, 96 S.Ct. at 1022 n. 9, 47 L.Ed.2d at 265 n. 9. This Court began to do so in *Hill v. State,* 339 Md. 275, 661 A.2d 1164 (1995).

In *Hill,* an African–American defendant was convicted by a jury of possession of cocaine and possession with intent to

distribute. The State's only witness was a white police officer. *Id.* at 277, 661 A.2d at 1165. The defendant challenged the conviction based on the trial court's refusal to inquire into racial bias during *voir dire.* In an unreported opinion, the Court of Special Appeals had affirmed on the ground that the charges did not reflect the use of violence and thus, under *Holmes,* failed to present special circumstances. *Id.* at 278, 661 A.2d at 1166. We reversed, despite the lack of interracial violence, holding that "as a matter of Maryland nonconstitutional criminal law, . . . the refusal to ask a *voir dire* question on racial or ethnic bias or prejudice under the circumstances of this case constituted reversible error." *Id.* at 285, 661 A.2d at 1169. In so doing, we embraced "in total[ ] the *Aldridge* analysis," and held that "[t]o the extent that our cases and those of the Court of Special Appeals are to the contrary, they are, to that extent, overruled." *Id.*

The *Aldridge* analysis, as noted, hinged the necessity of inquiry into racial bias, not on the notion that the factual circumstances of the case generate the issue, but on the possibility of "the bias of the particular jurors who are to try the accused." *Aldridge,* 283 U.S. at 314, 51 S.Ct. at 473, 75 L.Ed. at 1058. As the Court stated, "if any one of [the jurors] was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit." *Id.* Because the focus of *Aldridge* is on the possible bias of the individual jurors and not on the factual circumstances of the case, our embrace of the *Aldridge* analysis in *Hill* was simultaneously a rejection of the "special circumstances" limitation that had developed in both federal and Maryland case law. This return to our earlier jurisprudence responds to at least four factors.

First, the cases that the *Aldridge* Court discussed in arriving at the proposition that a requested *voir dire* question on racial bias is mandatory were not limited to special circumstances.[4] Prior to *Rosales–Lopez,* the United States Court of

---

**4.** *See, e.g., Pinder v. State,* 27 Fla. 370, 8 So. 837, 838 (1891) (holding that it was error not to inquire on *voir dire* whether a juror could give

Appeals for the Fourth Circuit recognized this. *See United States v. Gore,* 435 F.2d 1110, 1111, 1112 (4th Cir.1970) (stating that *"Aldridge* does not expressly limit its holding to crimes of interracial violence," and noting that "the Court derived the rule it announced from sources that did not attach controlling significance to whether or not the crime involved persons of the same race"); *see also Rosales–Lopez,* 451 U.S. at 197, 101 S.Ct. at 1639, 68 L.Ed.2d at 34 (Stevens, J., dissenting) (noting that *Aldridge* "followed a long line of state-court decisions," and that neither *Aldridge* itself nor "the reasoning in the state-court opinions . . . relied on such special circumstances").

The second reason concerns how the racial bias of jurors might impact a verdict. Under the *Ristaino* rule, it is thought that a juror could be biased, and yet that this juror could evaluate a case involving a minority defendant fairly, unless "[r]acial issues . . . [are] inextricably bound up with the conduct of the trial," or unless special circumstances exist that would "intensify any prejudice that individual members of the jury might harbor." *Ristaino,* 424 U.S. at 597, 96 S.Ct. at 1021, 47 L.Ed.2d at 264. *Aldridge,* by contrast, assumes that it is worthwhile to inquire into prejudice because the risk of its presence is not remote, and because "if any one of [the jurors] was shown to entertain a prejudice which would preclude his rendering a fair verdict, [then] a gross injustice would be perpetrated in allowing him to sit." *Aldridge,* 283 U.S. at 314,

---

"a negro[ ] as fair and impartial a trial as you could a white man," but stating no special interracial circumstances); *Hill v. State,* 112 Miss. 260, 72 So. 1003, 1003 (1916) (holding that "the trial judge erred in refusing to allow the jury to be examined with reference to race prejudice" simply because the "defendant on trial was a negro, and was being tried by white men"); *People v. Decker,* 157 N.Y. 186, 51 N.E. 1018, 1019–20 (1898) (affirming the exclusion of a juror who had stated that he would be influenced by the race of the defendant, an African–American man, and the victim, his Caucasian wife, but not stating that an inquiry into bias is limited to interracial crimes); *State v. McAfee,* 64 N.C. 339, 340 (1869) (per curiam) (holding, without stating the facts of the case, that it was reversible error for the trial court not to inquire whether a juror could "do equal and impartial justice between the State and a *colored* man").

51 S.Ct. at 473, 75 L.Ed. at 1058. It is more realistic to believe that bias will impair impartiality whether the case presents special circumstances or not.

Third, the *Ristaino* special circumstances limitation rests in part on the ground that "requiring an inquiry in every case is likely to create the impression 'that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth.'" *Rosales–Lopez,* 451 U.S. at 190, 101 S.Ct. at 1635, 68 L.Ed.2d at 30 (alteration in original) (quoting *Ristaino,* 424 U.S. at 596 n. 8, 96 S.Ct. at 1021 n. 8, 47 L.Ed.2d at 264 n. 8). This Court struck "a different balance." *Hill,* 339 Md. at 284, 661 A.2d at 1168. When a minority defendant requests an inquiry into racial bias on *voir dire,* the defendant seeks to exclude those who might be influenced by such factors. This process creates the impression, not that "justice in a court of law may turn upon" race, but instead that racial bias will not be tolerated in members of a jury.[5]

Fourth, not requiring "special circumstances" facilitates the ultimate disposition of cases. Circuit court judges need not concern themselves over whether the facts of the case meet the special circumstances standard. Further, under the procedures we announce in Part IV, *infra,* the burden of making the inquiry ordinarily will be slight, particularly in comparison to the expenditure of resources involved in a new trial.

## C. The State's Argument

The State contends that, although *Hill* "went beyond the standard previously stated by the Supreme Court and prior Maryland cases by eliminating the violent crime requirement," the decision "was nevertheless tethered to 'the circumstances of this case,' i.e., the fact that the State's sole witness was

---

**5.** *See* L.A. Giantris, Note, *The Necessity of Inquiry into Racial Bias in Voir Dire,* 55 Md. L.Rev. 615, 631 (1996) (noting that the concern of the plurality in *Rosales–Lopez* that mandatory racial or ethnic *voir dire* will create the impression that justice turns on these factors "seems somewhat exaggerated given that the clear message voir dire racial bias questioning sends to both jurors and to the public is that racial bias will *not* be tolerated in court proceedings").

white and the defendant was African–American." Brief of Respondent at 8–9. The State cites *Davis v. State*, 333 Md. 27, 633 A.2d 867 (1993), for the proposition that "[b]ias on the part of prospective jurors will never be presumed, and the challenging party bears the burden of presenting facts ... which would give rise to a showing of actual prejudice." *Id.* at 38, 633 A.2d at 872 (internal quotation marks omitted) (quoting *Borman v. State*, 1 Md.App. 276, 279, 229 A.2d 440, 441–42 (1967)).

In *Davis*, a defendant charged with distribution of cocaine and heroin, who contended that at trial "the sole issue ... [was] the credibility of the police officer as [o]pposed to [the defendant]," *id.* at 35, 633 A.2d at 871 (ellipsis, and second and third alterations, in original), requested the following *voir dire* question: "[W]hether anyone on the jury has been a member or is a member of the law enforcement community or whether they have a close relative or friend who is such a member." *Id.* at 33, 633 A.2d at 870. The trial judge did ask whether "any of the jurors is 'likely to give more or less weight to the testimony of a police officer merely because that person is a police officer.'" *Id.* We rejected Davis's argument that the trial court erred in refusing to propound his requested question because

> "the professional, vocational, or social status of a prospective juror is not a dispositive factor establishing cause to disqualify. Rather, the proper focus is on the venire person's state of mind, and whether there is some bias, prejudice, or preconception. Short of those instances where there is a demonstrably strong correlation between the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror."

*Id.* at 37, 633 A.2d at 872.

The portion of *Davis* on which the State relies simply means that a prospective juror's *status*, whether that be professional, social, or whatever, is not by itself a sufficient ground for disqualifying the juror, and that therefore it is within the

discretion of the trial court to deny a requested *voir dire* question directed to the issue of status. We explicitly distinguished status from "the venire person's state of mind," in which could inhere some "bias, prejudice, or preconception," that would render the person partial and hence unfit as a juror.

■ Accordingly, we reject the State's reliance on a reduced version of a special circumstances requirement when racial prejudice is the concern to which *voir dire* is sought to be directed. Based on *Hill*, Hernandez was entitled to a question on *voir dire* directed to racial prejudice, if properly requested.

## II

In *Contee v. State*, 223 Md. 575, 165 A.2d 889 (1960), an African–American defendant requested questions on racial bias that were improper because "none was reasonably calculated to elicit or ascertain such bias or prejudice as would disqualify a prospective juror from rendering a fair and impartial verdict." *Id.* at 580, 165 A.2d at 892. Nonetheless, this Court reversed the conviction because "the [trial] court failed to ask *on its own motion*, as it should have done, a proper question designed to ascertain the existence of cause for disqualification on account of racial bias or prejudice." *Id.* at 580, 165 A.2d at 893 (emphasis added). The trial court ought to have done so because the requested questions, although improper, "fully apprised [the trial court] of the essence of what the defendant was seeking." *Id.* The requested improper questions were as follows:

"3. Whether any juror had ever 'belonged to or been affiliated with any organization that had to do with segregation of the races?'

"4. Whether any juror believed 'in segregation?'

"5. Whether any juror had 'an opinion as to' the impropriety of 'people of the white race' having 'sexual intercourse with people of the colored race?' and if so 'whether

the opinion was adverse to the race' of the defendant, who was a Negro?

"6. Whether any juror would 'believe a woman of the white race over the statement of a man of the colored race?'

"8. Whether any juror had 'ever been involved personally or through close family association in any criminal matter' concerning 'the prosecution of a colored man' for an act of violence?"

*Id.* at 579, 165 A.2d at 892.

■ Here, question sixteen referred, among other things, to racial bias. After Hernandez had excepted to the failure to ask question sixteen, the State specifically directed the court's attention to the issue of race, saying, "I think I have seen some cases that dealt with No. 16 basically saying [that] if they ask, they shall receive," and "I would urge the Court to go ahead and ask No. 16 in terms of the racial question." The request and exception by the defense, coupled with the State's clarification, were sufficient to trigger the *Contee* duty on the trial court to submit a question related to race.

■ Although, if requested, a *voir dire* question specifically referring to possible racial bias against the accused must be asked, the question need not be limited exclusively to possible racial bias. Trial courts have a discretion to include, along with the inquiry specifically addressing racial bias, inquiry concerning one or more other possible biases. A trial judge may conclude that a multiple-choice form of question directed to the entire venire may be more effective in eliciting an affirmative response, and that the specifics then can be inquired into when affirmatively responding veniremembers are questioned on an individual basis.

A question related to racial bias against Hernandez would have left to the eye of the beholder the matter of identifying Hernandez to a race. Hernandez was introduced to the venire, as was the interpreter. The record does not inform us what Hernandez looks like. He may be a direct descendent of people indigenous to Central America, or of Spanish conquistadores, or of people from sub-Saharan Africa, or of some

combination of the above, or of none of the above. A question related to racial bias would have left the respective veniremembers who might be so disposed free to associate Hernandez with that veniremember's concept of race based on the subjective impression that Hernandez had made on that particular veniremember. Any particular veniremember who bore a bias against persons of the "race" in which that veniremember categorized Hernandez would have been obliged to answer affirmatively a question related to race.

■  We hold therefore that a *voir dire* question as to bias against persons of the defendant's race should have been asked. This holding does not rest on, and is not limited to, cases where the accused is a member of a cognizable minority group. Under the *Aldridge* analysis that we adopted in *Hill,* any defendant, of whatever race, is entitled to have the trial court propound a requested *voir dire* question specifically directed at uncovering racial bias. The focus under our analysis is the potential bias of a prospective juror. Without regard to the race with which the accused self-identifies, racial bias can be directed at an accused based on the race to which a prospective juror subjectively assigns the accused.

Whether Hernandez was entitled to a more specific *voir dire* question as to bias against Hispanics is an issue that we address in Part IV, *infra.*

### III

■  The State argues that, even if Hernandez was entitled to a question on racial bias, the circumstances of the *voir dire* in this case were such that the trial court fairly covered racial bias. Principal among the circumstances to which the State refers are that

"[d]uring the *voir dire,* the court asked defense counsel to introduce Hernandez and have him stand. With an interpreter present and translating, he did so. After asking if anyone knew Hernandez, the court asked, 'Do any of you

have any bias or prejudice either for or against the defendant?' "

Brief of Respondent at 13.

The cases reviewed in Part I, however, demonstrate that the trial court's general question on bias was not sufficient to cover racial bias. *See Ham,* 409 U.S. at 526 & n. 3, 93 S.Ct. at 850 & n. 3, 35 L.Ed.2d at 49 & n. 3 (reversing a conviction where the trial court refused to ask specifically about racial bias, but did ask whether prospective jurors were "conscious of any bias or prejudice for or against" the defendant); *Hill,* 339 Md. at 278, 661 A.2d at 1165 (reversing a conviction where the trial court refused to ask specifically about racial bias, but did ask "whether any member of the jury panel 'knew of anything that would keep her or him from giving a fair and impartial verdict' ").

As we have stated previously:

"Merely asking general questions, such as, 'is there any reason why you could not render a fair and impartial verdict,' is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case. Those *voir dire* questions, however, should be framed so as to identify potential jurors with biases which are cause for disqualification, rather than merely identifying potential jurors with attitudes or associations which might facilitate the exercise of peremptory challenges."

*Davis,* 333 Md. at 47, 633 A.2d at 877.

Inasmuch as the concern of both the defense and the State was with racial prejudice, the trial court should have asked a question that was designed to have the veniremembers search their respective consciences as to any bias based on the race to which they had subjectively assigned Hernandez.

## IV

As explained in Parts I, II, and III, *supra,* the trial court erred in not propounding a question related to race. The

State does not contend that, if the trial court erred, the error can be harmless beyond a reasonable doubt. Accordingly, our mandate is a reversal for a new trial. Nevertheless, we are constrained to address another argument for the guidance of the trial courts generally in this important area of the law.

The entire thrust of the Hernandez brief in this Court is that the trial court should have inquired concerning bias against Hispanics. In its brief, the State meets Hernandez on that ground, without directly challenging the step in the argument that moves from a request concerning race to a question concerning Hispanics. The trial court was not obliged, under *Contee* or otherwise, to take that step absent a specific request from the defendant that incorporated that step.

To hold otherwise would open a very large can of worms for circuit courts. Although the term "Hispanic" in Maryland anti-discrimination law denotes a class of minority persons who are statutorily protected, *see* Md.Code (1984, 1999 Repl. Vol.), § 9–301(d)(2)(v) of the State Government Article, and although individual prospective jurors could have biases against Hispanic persons, trial courts should not treat "Hispanic" as describing a race unless the accused so requests.

In *Commonwealth v. De La Cruz*, 405 Mass. 269, 540 N.E.2d 168 (1989), the court considered whether its case law requiring individual *voir dire* of jurors in certain interracial crimes applied where a Hispanic male was charged with sexually assaulting an eight year old "white" girl. 540 N.E.2d at 169. The court held that the rule did not apply because "[e]xcept where the defendant and the alleged victim are clearly members of different races in the traditional sense, we think that the judge on the scene ordinarily is in the best position to determine whether justice and the appearance thereof are best served by individual voir dire of potential jurors." *Id.* at 171. Undertaking to explain the "traditional sense" of race, the court said:

> "The word, 'race,' has historically referred to any of the three primary divisions of humanity as distinguished by skin

color: Caucasian, Mongolian, and Negro. Webster's New World Dictionary 352 (1970). *Id.* at 69, 278, 288. Thus, this case involves a defendant and an alleged victim of different ethnic backgrounds, not of different races in the traditional sense. The word 'Hispanic,' ordinarily refers, not to race, but to national origin. *See Commonwealth v. Aponte,* 391 Mass. 494, 509, 462 N.E.2d 284 (1984). The term, 'Hispanic,' may refer to persons with various national origins, such as Puerto Rican, Mexican, Cuban, and Spanish, *id.* at 495 n. 3, 462 N.E.2d 284."

*Id.* at 170. *See also Commonwealth v. Burgos,* 36 Mass.App. Ct. 903, 627 N.E.2d 471, 473 (1994); *Commonwealth v. Ramos,* 31 Mass.App.Ct. 362, 577 N.E.2d 1012, 1014 (1991).

The view that "Hispanic" is not a race is in accord with the federal government's scheme for racial and ethnic classification in agency reporting. In the 1970s, the Office of Management and Budget (OMB) instituted classifications for the purpose of standardizing the collection of racial and ethnic data among federal agencies. *See* Transfer of Responsibility for Certain Statistical Standards from OMB to Commerce, Dep't of Commerce, Directives for the Conduct of Federal Statistical Activities, Directive No. 15, Race and Ethnic Standards for Federal Statistics and Administrative Reporting, 43 Fed.Reg. 19,260, 19,269 (1978) [the Directive]. The Directive listed the following races: (1) American Indian or Alaskan Native; (2) Asian or Pacific Islander; (3) Black; and (4) White. The Directive also listed two ethnicities: (1) Hispanic origin; and (2) Not of Hispanic origin. Allowing for the possibility of using a "combined format ... to collect racial and ethnic data," the Directive specified the minimum categories on this approach as follows: (1) American Indian or Alaskan Native; (2) Asian or Pacific Islander; (3) Black, not of Hispanic Origin; (4) Hispanic; and (5) White, not of Hispanic origin. In either case, the OMB defined Hispanic as "[a] person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, *regardless of race.*" (Emphasis added).

While the Directive has been changed in order to allow multi-racial respondents to check more than one box when identifying their race,[6] it has preserved the same definition of Hispanic just noted. Thus, for over twenty years, the federal government has distinguished "Hispanic" as an ethnicity, not a race.

The very attempt to determine whether "Hispanic" is a race or ethnicity is difficult in light of conflicting views on the nature of race. Some researchers interpret race to be, not a biological phenomenon, but a social construct. *See, e.g.*, A. Littlefield et al., *Redefining Race: The Potential Demise of a Concept in Physical Anthropology*, 23 Current Anthropology 641, 641 (1982) (noting that "the race concept has been attacked as invalid because populations of humans separated by significant reproductive barriers and/or exhibiting concordant combinations of variable physical traits cannot be shown to exist"); F.B. Livingstone, *On the Non–Existence of Human Races*, 3 Current Anthropology 279, 279 (1962) (acknowledging that there exists "biological variability between the populations of organisms which comprise a species," but advocating that the concept of race be abandoned because "this variability does not conform to the discrete packages labelled races"); *see also Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 610 n. 4, 107 S.Ct. 2022, 2026 n. 4, 95 L.Ed.2d 582, 590 n. 4 (1987) (citing sources in anthropology for the proposition that "race" is more a sociopolitical concept than a biological one).

Other researchers recognize biological phenomena that are the referent of the concept "race," but doubt the utility of this concept as a scientific category or classificatory scheme. *See, e.g.*, T. Dobzhansky, *Comment*, 3 Current Anthropology 279, 279–80 (1962) (rejecting the view that "mankind has no races," but acknowledging that classification of "racially distinct populations" is "a matter of convenience and hence of judgment"); T. Dobzhansky, *Introduction, in Science and the Concept of Race* 77, 78 (M. Mead et al. eds.1968) (acknowledging the fact

---

6. *See* Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed.Reg. 58,782, 58,789 (1997).

that "inhabitants of different parts of the world are often visibly different" as the "essence of race as a biological phenomenon," but doubting the usefulness of race as a scientific category).

Others have argued that race is a biological phenomenon, and attempt to classify distinct races. *See, e.g.*, C.S. Coon, *The Origin of Races* 3 (1967) (employing a "conservative and tentative classification of the living peoples of the world into five basically geographical groups: the Caucasoid, Mongoloid, Australoid, Congoid, and Capoid").

Although researchers use different classifications, this Court's brief review has disclosed no classification that employs "Hispanic" as a race. *See* S. Molnar, *Race, Types, and Ethnic Groups* 12–22 (1975) (reporting the racial classification schemes used by various anthropologists, none of which identifies "Hispanic" as a distinct race). The most common list of races seems to consist of three categories: Caucasoid, Negroid, and Mongoloid. *See, e.g.*, P.W. Hedrick, *Genetic Populations* 17 (1983) (reporting a study on "[a]llelic frequencies for four different blood groups in three different racial groups," which study identified the groups as Caucasoid, Negroid, and Mongoloid). Even researchers who express some hesitation as to this list use it. *See, e.g.*, D.L. Hartly & A.G. Clark, *Principles of Population Genetics* 301–06 (2d ed.1989) (adopting the concept of "the three major human groups—Caucasoid, Negroid, Mongoloid," but also noting as a possible inference of a genetic population study that "there is much more genetic variation *within* than *among* human races").

Here, Hernandez argues that the trial court should have taken that part of his broad request that related to racial prejudice to mean prejudice against Hispanics. Adopting that argument would put the courts in the business of resolving the dispute between anthropologists as to what "race" means, and then assigning an accused to the race that the court thinks is appropriate. This is not the role of a court, in any but the most extraordinary case in which that might be the issue to be decided. The trial court was not required under *Contee* to

propound a *voir dire* question in which the court, on its own initiative, identified Hernandez as Hispanic.

We recognize that, for purposes of the unconstitutionally discriminatory use of peremptory challenges in jury selection under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny, Hispanics or Latinos/as are a "cognizable group." *Mejia v. State*, 328 Md. 522, 530 & n. 4, 616 A.2d 356, 359 & n. 4 (1992). *See also Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (petit jury); *cf. Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (grand jury composition). Similarly, Hispanic or Latino persons should be considered to be a cognizable group for purposes of inquiring on *voir dire*, upon request, whether any veniremember is prejudiced against that particular cognizable group. The distinction between the peremptory challenge cases and the instant matter is that in the former the party objecting to the use of peremptory challenges identifies the cognizable group that is allegedly being excluded, in order to make a record, while, here, Hernandez never particularized his question beyond a reference to race generally.

In the instant matter, it was not even suggested until argument on the motion for new trial that the cultural background of Hernandez was the true object of question sixteen. If Hernandez sought a *voir dire* question directed to prejudice against Hispanic persons, it was his obligation to identify himself as such and to request an inquiry on bias against Hispanics. Had he done so, he would have been entitled to having that question asked, without the need for special circumstances, in the same manner as if the request related to race.

## V

The result of our holdings above is that the accused has a tactical option concerning *voir dire* questions directed to race, but not as to ethnicity or cultural heritage. With respect to race, the accused may have a racial bias question submitted

which does not identify the accused to a race and which will leave identification to race to whatever conclusion any particular veniremember might draw based on physical observation. Alternatively, the accused may request a question in which the accused identifies himself or herself to a particular race. With respect to ethnicity or cultural heritage, however, the accused must identify the particular cognizable group and include himself or herself in that group. In none of these three scenarios is the trial court obliged to assign the accused to a race, ethnicity, or cultural heritage. When the accused has self-identified to a race, ethnicity, or cultural heritage, the trial court should make clear to the venire that the identification of the accused to the particular cognizable group has been made by the accused. Where a *voir dire* question has been properly requested and directed to bias against the accused's race, ethnicity, or cultural heritage, the trial court ordinarily will be required to propound such a question, regardless of the existence of special circumstances.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THIS CAUSE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND.**